## WILLIAM NEELY THOMPSON, Respondent, v. WILLIAM GIBB et al., Appellants.

### No. 3675; January 21, 1865.

Mines—Cotenancy or Partnership in Property.—Under an instrument by which the lessee of a mine transfers for value a fractional interest in the latter and agrees to conduct the business of the mine for the transferee as well as himself, and be sole agent irrevocably for the transferee in all matters in that regard, the parties become, as to the mine, tenants in common of the leasehold estate and, as to the business, partners.

Agency—Delegation of Duties.—The Agreement by the Manager of an enterprise of great magnitude to be his cotenant's agent in that connection does not contemplate his devoting always his own personal service to the carrying out of the agency; he may delegate the performance of local services, since his own presence often may be needed elsewhere for the good of all.

Partnership—Death of Partner—Dissolution.—In the absence of an intention to the contrary expressed in the clearest and most unambiguous terms in the instrument establishing the relation of partners, the death of a partner dissolves the partnership, and the surviving partner becomes clothed with authority to close up the business.

Injunction—Inconvenience of Person Restrained.—If a Tenant in Common of land, the usufruct of which belongs to him and his cotenant jointly as partners or otherwise, wrongfully excludes the cotenant of all beneficial use of any share, he cannot complain that an injunction to restrain him in this connection interferes with his beneficial enjoyment of his own share.

APPEAL from Twelfth Judicial District, San Francisco County.

James Lake & Dwinelle for respondent; E. Casserly and B. S. Brooks for appellants.

A rehearing was granted June 5, 1865, but there is no record of any decision ·or opinion on rehearing.

CURRY, J.—The New Idria Mining Company by deed executed on the 28th of January, 1858, granted and leased to Daniel Gibb a tract of land in Fresno county in this state known as the New Idria Mine, containing therein a quicksilver mine, and also the appurtenances to the same belonging, for the term of ten years. Under this grant the lessee and his heirs and assigns were granted the privilege of working the mine and extracting therefrom quicksilver. On the 25th of August following Daniel Gibb and the plaintiff entered into an agreement in writing under seal by which the former assigned and conveyed to the latter one-third part or interest of the lease and the estate and property granted by the New Idria Mining Company to said Gibb. This assignment and conveyance was made upon certain terms and conditions therein expressed, as well as for a money consideration specified, and also contained therein certain reservations. It was provided that the plaintiff should be liable and responsible to Daniel Gibb for one-third of all the expenditures made by him before that date and which should be thereafter incurred in and incidental to the working of the mine, and also one-third of all expenditures and outlays made or to be made by Daniel Gibb as lessee of the mine and property, provided the same should be limited to fifty thousand dollars above the receipts and products arising from working the mine, unless the plaintiff consented in writing to a greater amount. It was also provided that Daniel Gibb should be, until the termination of the leasehold, the sole agent and attorney irrevocably of the plaintiff, and of the interest assigned and conveyed to him, in all matters and things in any way appertaining to or concerning the lease and the interest assigned and conveyed to the plaintiff, and that as such agent and attorney he should continue to work the mine and to manage the concerns thereof

and of the leasehold in the manner as to him might seem most to advance the interest of the parties concerned, but as such agent and attorney he should have no power to sell the interest so assigned and conveyed to the plaintiff. It was also provided that as such agent and attorney he should sell and dispose of the products of the mines and property leased, in this state or elsewhere, as he might deem proper, and should manage the affairs and business of the parties, charging and receiving therefor, over and above all the expenses of the management of the business, five per cent commissions on all sales of the products of the mine, and also five per cent commissions on all moneys disbursed in the working of the mine or in conducting the business of the same, and should also be allowed and paid, on all cash advances or outlays made by him on account of the business of the enterprise over and above the proceeds of sales, interest at the rate of two per cent per month payable half yearly, and for the due payment of the plaintiff's portion of all these outlays and expenditures made and liabilities incurred and which should be incurred and for the due payment of the commissions and interest specified, it was stipulated that said Gibb should have and hold a lien on the portion and interest assigned and conveyed to the plaintiff. It was also further provided that Gibb should keep all necessary and proper books and accounts of the transactions connected with the lease, or rendered necessary by the contract between the parties, and should, on demand, render to the plaintiff an account current or balance sheet of such transactions on the 31st of December and 30th of June of each year or as soon thereafter as the accounts could with reasonable diligence be prepared, during the term, ·when settlements should be made between the parties.

The parties to the contract entered into on the 25th of August, 1858, intended that it should have a retrospective operation so as to comprehend the prosecution of the mining enterprise from the time of Daniel Gibb's connection with it as lessee. This is apparent from the contents of the article of agreement entered into between them and also from their conduct in relation to the business subsequent to the date of this agreement. When this written assignment and transfer was executed Daniel Gibb was prosecuting the work of mining for quicksilver upon the leased premises, and thence onward until

July, 1861, continued the work, expending in the successful
conduct of the business large sums of money, and during the
same period extracted from the mine large quantities of quick-
silver, which he disposed of in various markets of the world,
receiving therefor large sums of money. During a part of the
time the plaintiff was at the mine acting in the capacity of
superintendent under and by the appointment of Daniel Gibb.
As the enterprise developed and the product of quicksilver in-
creased it became necessary to seek for markets where it could
be disposed of for the benefit of those concerned, and to that
end it was necessary to establish agencies abroad. In July,
1861, Daniel Gibb, who was a resident of this state, left here
for Europe professedly for the purpose of establishing busi-
ness connections or agencies there through which he might
make sales of the products of the mine. Previous to this a
short time a difference had arisen between the plaintiff and
Daniel Gibb respecting their mining interests, and accounts
connected therewith, and immediately before Gibb's departure
for Europe the plaintiff by his attorneys addressed and de-
livered to him a letter protesting against his leaving the state
while he remained agent of the mine and while his accounts
remained unsettled, warning him that if he persisted in going
abroad, it would compel the plaintiff to stop all mining opera-
tions until his rights might be determined. At this time the
plaintiff claimed that there was over thirty thousand dollars
due him on account of his interest in the proceeds of the mine,
while on the part of Gibb it was claimed that the plaintiff
was indebted to him on the mining enterprise account in a
large sum, and in answer to the letter protesting against his
leaving the state, he denied that plaintiff had any right to
make any such objection, and then stated that the plaintiff
had already been informed that one chief object which he had
in visiting Europe was to arrange foreign agencies for the
sale of the quicksilver product of the New Idria Mines, as well
as to attend to other necessary business of such mines and the
lease thereof, and advising him that he desired an early set-
tlement with him, and had granted to his brother ample powers
for the purpose, and further stating that he had made every
necessary arrangement for the efficient conducting of the busi-
ness of the mine in California during his absence attending to
its more pressing and important interests. When the lease was

executed by the New Idria Mining Company to Daniel Gibb he was, with others, engaged in a large mercantile business in the city of San Francisco. The style of his firm was Daniel Gibb & Co. In the spring of 1861 this firm was dissolved, and a new firm formed, consisting of Daniel Gibb, Alexander Forbes and William Gibb. In the formation of this partnership it was contemplated to continue the house of Daniel Gibb & Co. at the city of San Francisco, under its former name and style and also to establish another house at Glasgow, in Scotland under the name and style of Forbes, Gibb & Co. As an inducement to Forbes to become a member of this firm, Daniel Gibb proposed and agreed with him and William Gibb, that while he, Daniel Gibb, worked the mine, he would consign to the new firm during its continuance, for realization on account of those concerned in the mine, all the quicksilver products of the same which should be received in San Francisco, after the 1st of June, 1861. This partnership was formed, and the firm established as proposed a mercantile house in Glasgow, under the name and style of Forbes, Gibb & Co. The house in Glasgow was established by Daniel Gibb after his departure from this state. There Daniel Gibb remained until the 17th of December, 1861, when he died. During his absence, the defendant William Gibb had the business of the mining interests of the parties in this state in charge, under a power of attorney from his brother Daniel Gibb.

By his last will and testament Daniel Gibb appointed the defendant William Gibb his executor, but before the will was offered to the court for probate, William Gibb was appointed the special administrator of the estate, and thereupon became qualified and entered upon the duties of his office. After this and in February, 1862, the plaintiff filed his verified bill of complaint in the district court of the twelfth judicial district against William Gibb, special administrator of the estate of Daniel Gibb, deceased, William Gibb in his own person, Alexander Forbes and William H. Richards. In his complaint the plaintiff sets forth the facts contained in the article of agreement entered into between Daniel Gibb and the plaintiff on the 25th of August, 1858. The plaintiff alleged that Daniel Gibb worked the mine under the contract entered into between the parties thereto to the time of his departure for Europe, and obtained therefrom large and valuable products, and a

12

large amount of profits from the sales of quicksilver, and that of the profits thirty thousand dollars belonged to the plaintiff, for which Daniel Gibb in his lifetime refused to account and pay over to him, on the pretense that the mining enterprise was indebted to him upon a balance struck between it and him, and that the defendants Forbes and William Gibb had combined and confederated with Daniel Gibb to defraud the plaintiff by withholding from him the share of the profits due him, that they might jointly and severally profit thereby. This is the substance of the charge made against the defendants Forbes and William Gibb. The defendant Richards is also charged with permitting himself to be used as an instrument by which the alleged fraudulent designs of the defendants were sought to be consummated. In support of the general charge made the plaintiff states that Daniel Gibb omitted to keep the necessary and proper books and accounts respecting the business of the mine; that the books kept by him were neither true nor correct; that they contained false and fabricated charges, and omitted proper credits; that they were kept in an artful, complicated and complex manner to the end that the true state of the accounts might not be ascertained. That at various times he pretended to furnish plaintiffs with accurate accounts, which were not so, but on the contrary contained charges of expenses never incurred, interest which never accrued, and commissions never earned, and omitted to make credits of the proceeds of the mine, and that this course of conduct was pursued to induce the plaintiff to believe the mining business was not making any money above its expenses, and that the plaintiff was largely in debt in the premises instead of being entitled to thirty thousand dollars of the net profits thereof.

In support of these specific allegations, the plaintiff and a bookkeeper who had examined the books made affidavits, with which copies of the books were submitted, showing that the same contained entries made at intervals of about six months, of the aggregate quantity of quicksilver sold during the specified interval, and stating the net proceeds of such sales. The gross proceeds of the sales were not stated nor the particular dates when sales were made, nor when payments were received thereon. The plaintiff also by his affidavit makes an exhibit of thirty-two shipments of quicksilver to foreign ports, con-

taining the dates of the respective invoices and the ports to which shipped. The dates of only four of these thirty-two shipments were set forth in the invoice-book, and only five of the accounts of sales rendered by Daniel Gibb contained dates, and between these and the entries thereof in the cash-book there is an average difference of a little over five months; and as to a portion of the remainder of these shipments it does not appear at what particular time or times the sales of the quicksilver shipped were effected, otherwise than by the entries in the cash-book, as at the last end of the six months covered by the particular account for that period; and respecting thirteen of the thirty-two shipments no dates of sales appear by the invoice-book, nor by the accounts rendered, nor by the cashbook.

The plaintiff deposed that from a careful examination of the books, and the accounts rendered him by Daniel Gibb, he could find no dates of amounts of sales rendered by the consignees of quicksilver except as indicated in the thirty-two shipments mentioned; and he also deposed that Daniel Gibb had never rendered him any of the original account sales received from such consignees, nor copies of the same except in a single instance, and that therefore he had been unable to verify the accounts rendered in respect to the large items of interest dependent thereon, or in respect to the item of exchange growing out of the differences of foreign currencies in which the proceeds of sales were realized. He also deposed that many of the entries in the cash-book purporting to be for cash advanced by Daniel Gibb were made when he was in funds from the proceeds of the mine; and he charges that the same entries were fictitious, and made to enable said Gibb to obtain interest on pretended advancements in fraud of the plaintiff's right in the premises. The plaintiff further deposed that Daniel Gibb had, during nearly the whole period of their connection in business, obtained advances on the shipments made of the quicksilver of the mine to foreign ports, and that except as to three shipments, no entries whatever of advances were made in the books until sometime in May, 1862, when after repeated complaints of the plaintiff, Daniel Gibb, by entries in the book called the journal, gave credit for what he stated to be all such advances, amounting in the aggregate to about one hundred and ninety thousand dollars; that the

books failed to show in what form such advances were received; but he states that Daniel Gibb informed him that the same were made in sterling bills, which were mostly used by him in his commercial business, in which the plaintiff had no interest; and the plaintiff charges that such sterling bills were worth to said Gibb, and realized to him much more than the sums for which he had given credit. The plaintiff then charges that, by suppressing these advances, Daniel Gibb intended to deprive him of the benefit of the same in the reduction of the interest account ostensibly accrued and accruing against plaintiff as well as to secure to himself the profits of the exchange realized from such sterling bills, which profits he says he verily believes amounted to four thousand dollars. He states that the interest account alone on such advances, as finally credited by Daniel Gibb on the complaint of the plaintiff, amounted to twenty-seven thousand eight hundred and fifty-two dollars and seventy-seven cents. The plaintiff also deposed that the cash-book showed that Daniel Gibb charged commissions on interest, and interest on commissions paid himself, and he refers to entries made in the cash-book in verification of his statement on this point, and he also refers to the ledger, which contains an account against the plaintiff for money advanced to him, which the plaintiff alleges has passed through the cash-book and formed a part of the same on which the said Gibb charged commissions. The plaintiff further deposed that until March, 1862, Daniel Gibb was in the habit of compounding monthly the interest upon his advances, and then upon the plaintiffs remonstrating against this course of dealing, he attempted to correct it by making entries in the journal for the purpose. The plaintiff further deposed that Daniel Gibb opened in his books an account called "Rental account" which was of rents to become due his lessors—the New Idria Mining Company—for the mining premises and property, in which he credited himself with having paid the rents, when in fact he had paid no rents since August, 1859, and on such pretended payments of rent had charged interest and commissions.

The affidavit of the bookkeeper is in corroboration of the plaintiffs' allegations of misconduct in the matters of account between the parties, and shows affirmatively, from the books and other data of transactions from which he derived his in-

formation, that the amount of interest charged by Daniel Gibb against the plaintiff was largely in excess of that to which he was entitled, and also it tends to show that entries had been made in the cash-book from time to time of appropriations in advance of disbursements, the result of which was to make Gibb a creditor, charging interest and commissions while he was in funds from the proceeds of the mine with which to defray the expenses for which such appropriations purported to be made.

It is not necessary to particularize further as to the deficiencies and inaccuracies of these books and accounts. The plaintiff claims, and we think justly, that he was entitled, under the contract between himself and Daniel Gibb, to an account once in six months exhibiting truly the amount of sales of the product of the mine and when made, as well as the amount of moneys paid and disbursed by Daniel Gibb in carrying on the business of the enterprise in which they were mutually concerned. And that he might become informed of the condition of the affairs of the mining business, his associate Gibb was in duty bound to keep books and accounts which should exhibit the transactions of the mining business as they actually transpired, and from which the half yearly accounts to be rendered could be made up, so as to afford proper data upon which settlements between them could be made. He also maintains, and we think with equal justice, that Daniel Gibb had no right to appropriate to his own use the proceeds of sales of quicksilver after the same were received without giving to the plaintiff the immediate benefit of the share thereof belonging to him in extinguishment of the principal and interest due from him to his associate for advancements made on account of the mining business, and also that it was his duty to account for whatever gains might have been derived from the use thereof while the same remained in his hands; nor the right to charge commissions on interest, nor interest on commissions retained; nor the right to charge plaintiff with both interest and commissions on money advanced to him; nor to compound the interest upon the advances made by him on account of the mining business; nor to credit himself with having paid rents when in fact he had not paid the same.

The charges made by the plaintiff against Daniel Gibb and the defendants were sought to be met by the defendant Will-

iam Gibb, either by direct denial or matters in avoidance; and in reference particularly to the conduct and management of the business of the mine and the disposition of its products and all matters connected therewith, prior to the departure of Daniel Gibb to Europe, we shall consider the affidavits of William Gibb as controverting the allegations of the plaintiff tending to impeach their fairness and compliance with the provisions of the contract entered into between the parties. And so far as the defendant Forbes has been or may be concerned in the controversy, we shall regard his affidavit and the affidavits of William Gibb as to his connection with the matters in issue as exonerating him from any wrongful intent toward the plaintiff; though from his connection with the firm of Daniel Gibb & Co., and through it with Daniel Gibb as he individually stood related to the plaintiff in business, he must abide, as the consequence of his predicament, the result of the controversy between the plaintiff and the representatives of the estate of Daniel Gibb, deceased. The defendant Richards, as the holder of the promissory note due from the plaintiff to Daniel Gibb, and as having received it when overdue, must be regarded as having accepted its transfer subject to all equities and equitable or other lawful defenses which at that time existed in favor of the plaintiff against the enforcement of its payment in the hands of Daniel Gibb.

The matters charged in the complaint and affidavit of the plaintiff, taken as true, in our judgment authorized and demanded the interference of the court below by the injunction granted; and the right to this remedy to secure redress for the injuries and grievances which the plaintiff had sustained by the misconduct of his associate in business, as alleged in the most solemn and accredited mode, must be deemed as established for the purposes of the case as it now stands before us, unless it appear that the matters so alleged and sustained by other evidence in corroboration was reduced at least to a state of equipoise by the affidavits and proofs produced on the part of the defendants.

Regarding the affidavits of William Gibb as putting in issue the allegation of the plaintiff's complaint and affidavit, is perhaps giving to them more importance than is their due; but so regarded, they fail to overcome the plaintiff's proof derived from the books and other data obtained from Daniel

Gibb, supported by the affidavit of the bookkeeper, who carefully examined them, as well as by that of the plaintiff. The evidence drawn from this source, the defendants did not attempt to controvert by a denial that the facts were as appeared by these books, and other data constituting evidence of transactions connected with the mine and with sales of its products, of which the books furnished no accurate detail. The evidence which these books and the accounts obtained from Daniel Gibb furnished is strongly corroborative of the most material portions of the plaintiff's complaint, and is strongly in support of his allegations of the wrongs and injuries of which he complained.

It is not our purpose to express an opinion as to all the questions submitted to us in this case, as to do so we apprehend would not afford to the parties any more certain guide for the future than they now have, and if it would, we deem it inexpedient to do so, as the undertaking would involve a labor perhaps without precedent in this court, and would require an opinion of inexcusable length.

The record and argument of counsel exceed seven hundred printed pages, all of which we have examined and to the same have given a deliberate consideration.

By the instrument in writing entered into between the parties in August, 1858, Daniel Gibb was declared to be the agent, and it was agreed that he should continue to be, until the termination of the lease therein referred to, the sole agent and attorney irrevocable of the plaintiff, and of the interest conveyed to him, in all matters and things appertaining or in any way belonging to and concerning the lease and the interest in the lease conveyed to him by such instrument, and that said Gibb should continue to work the mine and manage the concerns thereof and of the lease in such manner as to him might seem most to the advantage and interests of those concerned therein.

The plaintiff's counsel insist that the office of Daniel Gibb as the agent and manager of the mining business of the parties could be fulfilled only by his personal service, and that as a consequence he could not delegate to a substitute the performance of those services, and that by attempting to do so and leaving the state without the plaintiff's consent, he abandoned the contract and thus by his own act rendered further per-

formance of his duties as agent and manager impossible.  But
these consequences, in our view of the duties appertaining to
Daniel Gibb's agency, do not necessarily follow.  The magni-
tude of the enterprise required that many of the duties con-
nected with it should be performed by subordinates of his ap-
pointment; and it might be that his personal attention to the
business in its relations to foreign markets was as necessary to
the successful prosecution of the enterprise, as the same was
at home—and we think in such event it was competent for him
to appoint a discreet and proper person to superintend and
manage in his stead the affairs of the concern at home during
his absence abroad.  Whether or not he appointed a proper
substitute to act in his stead during his absence it is not im-
portant to inquire, now that Daniel Gibb is dead.

It is argued on plaintiff's behalf that as the contract be-
tween the parties was for the personal service of Daniel Gibb
as the agent and manager of the business of the mine, includ-
ing all necessary expenditures and all sales of its products,
the agency created and the powers reserved or granted, as the
case may be, ceased with his death; while on the part of the
defendants it is maintained that the powers reserved by Daniel
Gibb, and conceded by the plaintiff as manifested by their
contract, were powers coupled with an interest in Daniel Gibb
in the subject matter to which the contract related; and this
fact being assumed as true, it is argued that the agency, with
all its incidents, survived the death of Daniel Gibb and of
consequence passed to those who succeeded to his estate as
his heirs, legatees or devisees or personal representatives.
Daniel Gibb was not and could not be, in a strictly legal sense,
the agent of his own interest in the mine and the contem-
plated productions of it.  When he granted to the plaintiff
one-third of his interest and estate in the leasehold and prop-
erty of the mine he reserved the right to manage and conduct
the business of the enterprise.  With the property acquired
by the plaintiff by the grant, the agency reserved or derived
was not united by any interest of Daniel Gibb therein; nor
had he a property interest in the plaintiff's share therein,
except by way of mortgage or lien as security for the due pay-
ment of all outlays and expenditures made or liabilities in-
curred or to be incurred on account of working the mine
and managing the concerns thereof, and as security for the

due payment of the commissions and interest to which he should be entitled according to the provisions of the contract. After the conveyance to the plaintiff of the one-third of the leasehold estate and interest in the mine, Daniel Gibb had no power, reserved or granted, to convey the same to any person. He had, as already appears, the sole and irrevocable power to manage the business in which they were jointly concerned; and over the plaintiff's share his power did not extend as a power coupled with an interest, with the incidents appertaining to this class of powers. He had a lien upon the share conveyed to the plaintiff at the moment it vested in him, provided outlays and expenditures had then been made or liabilities incurred beyond his receipts from the sales of the products of the mine; and also to secure the payment for such outlays and expenditures as might thereafter be made or fairly incurred and for interest thereon and commissions which might accrue, beyond receipts in hand, a lien might arise; but that such a lien was then or might thereafter arise and exist did not unite the interest of the plaintiff in the leasehold property with the power reserved to Daniel Gibb to work the mine and manage the mining business as principal in his own behalf and as agent for the plaintiff as to his share and interest therein.

Had Daniel Gibb lived the power reserved would have remained irrevocable unless cause had been shown for the interposition of a court of equity and for the exercise of its equitable jurisdiction depriving him of it. But when he died the agency which he had exercised in the premises for the plaintiff no longer survived.

The plaintiff and Daniel Gibb, as to the leasehold estate, were tenants in common, and as to the business of mining and the products of the mine and the moneys arising therefrom, they can only be considered as partners. By the contract between them the plaintiff granted to his partner the power to manage the business of the partnership, and by the same instrument certain rights were reserved to each of the parties, and certain duties and obligations were assumed by them respectively. Their relations to each other were analogous to those of the parties in Dunham and Dimon v. Jarvis and others, reported in 8 Barb. 88, which was a case where a ship was owned and employed by the parties to the suit. As to

the ship they were owners as tenants in common; but it was said by the court, as to the freight, the parties were partners and liable to the rule which governs the court in all cases where the partners do not agree, but one ousts the other; in which case a receiver will be appointed, when necessary to the protection of the interests of the parties.

It is argued by the defendants' counsel, upon the authority of adjudged cases, that there can be no ouster between tenants in common in possession, and therefore if one takes more than his share of the profits, the only remedy is by account or by bill in equity: Searle v. Colt, 1 Younge & C. 42; Frink v. Mornwaring, 2 Beav. 119; Tyson v. Fairclough, 2 Sim. & S. 144; Street v. Anderton, 4 Bro. C. C. 414. The suit by the plaintiff is by bill in equity having for its object to obtain a judicial determination of his right in the premises as a surviving partner, and further to obtain an account from the representative of Daniel Gibb, and his agents in whose hands was a portion at least of the partnership assets.

By the death of Daniel Gibb not only did the agency which he before then exercised in respect to the plaintiff's interest in the mining business become extinct, but the partnership existing between them in working the mine became dissolved, and the rights which pertain to a surviving partner upon dissolution of the partnership by the death of one of the partners thereupon accrued to the plaintiff, and he then became clothed with authority to proceed and close up the business of the partnership: Ex parte Williams, 11 Ves. 5; Villiamy v. Noble, 3 Meriv. 614.

The agreement by which their partnership relations was established did not provide for its continuance after the death of Daniel Gibb. Even if the language of the instrument tended to support the theory of a continuance of the partnership after Gibb's death, it would not be admissible to hold that it survived that event, so long as the question might be involved in reasonable doubt, for in the absence of the clearest and most unambiguous language establishing that Daniel Gibb provided for the continuance of the partnership, it cannot be found that he designed that the estate which he might leave at his death should be embarked in an enterprise to be managed by his surviving partner or some other person: Story on Partnership, sec. 319a.

The plaintiff complains of the violation on the part of Daniel Gibb during his life, and by the defendant William Gibb subsequently, of the partnership obligations imposed by the agreement between the original parties on Daniel Gibb; and he alleges a threatened continuance of wrongs operating in a denial and destruction of his rights and prerogatives in the premises; and the question is presented whether the court should interpose for his protection by injunction until the proper remedy may be administered for his relief. The injunction granted restrains the defendants, their agents, attorneys and servants from interfering or meddling with the interests of the plaintiff in the lands and mine, and from interfering or meddling with or disposing of any of the quicksilver products of the mine, or of the rents, issues, proceeds or profits thereof or the moneys arising therefrom, which have come or may come to them or either of them, or under their control, subsequent to the seventeenth day of December, 1861, on which day Daniel Gibb died. And also from negotiating, assigning or transferring the promissory note in the hands of the defendant Richards, or from commencing any other action thereon than the one then pending.

It is claimed on the part of the defendants that this injunction interferes with the interest of the estate of Daniel Gibb in the mine, and that by it his successors in interest, represented in the person of William Gibb, are prevented from the use and enjoyment of the portion of the premises which belongs to them. But is this true by the terms of the injunction? It was the plaintiff's interests in the lands and mine and the quicksilver products, proceeds and profits thereof that the injunction operated to protect and nothing more. That he was entitled to protection as to these results from the rights which he then possessed as the owner of one undivided third of the property, real and personal, and as the survivor of the partnership. It may be true that the interest of the estate of Daniel Gibb, deceased, in the mine could not, while the injunction may be in force, be rendered of use and profit, because of its conditions as interblended with the interest of the plaintiff therein, but that is a predicament of its condition, and is unavoidable, unless the plaintiff's interest is denied protection. If the party holding an undivided interest in property as a tenant in common with another, the usufruct

of which belongs to them jointly, as partners or otherwise, wrongfully excludes that other from it and all beneficial use of any share of it, he cannot justly complain if he is so restrained from interfering with or using his companion's share as also to become deprived of the use and enjoyment of his own. The maxim is, Sic utere tuo ut alienum non laedas. In Hall v. Hall, 12 Beav. 417, the master of the rolls said: "If the court of chancery cannot interfere in partnership affairs without great loss to both parties, is it fitting that one of them should in the meantime be permitted to act in such a manner as to make it impossible for the other to enjoy his undoubted rights, and insist on having his own way in everything, even to the exclusion of his copartner? This sort of proceeding cannot really be allowed."

If Daniel Gibb had continued to live, it may be the working of the mine and his management and prosecution of the business of the enterprise could not have been suspended by injunction, nor a receiver or manager appointed to take charge of it, provided adequate security was given on his part to account and pay to the plaintiff his share of the proceeds of the mine (Dunham v. Jarvis, 8 Barb. (N. Y.) 88; Street v. Anderton, 4 Bro. C. C. 414), but having died, new relations between the plaintiff and those succeeding to the property rights of the deceased arose. By this event the agency of Daniel Gibb for the plaintiff ceased, the partnership in working the mine became dissolved and the plaintiff succeeded to the rights of a surviving partner, and as such is in a position to require an accounting by the personal representatives of the deceased and the immediate agents whom he employed to dispose of the products of the mine.

This case has been ably and elaborately argued by the counsel engaged in its investigation, and many decisions of courts and works of elementary writers of high authority have been cited in support of the positions by them respectively assumed, which we have not passed by without examination, but we have omitted any special reference to many of them because of the great length to which our opinion would be extended were we so to do.

What may appear to be the ultimate rights of the several parties to this suit when the same comes to be tried and determined upon the merits, we can have no opinion. But if it

shall then appear that the plaintiff is indebted to the estate of Daniel Gibb, to secure which a lien exists upon his interest in the property, the court below will have the power to afford the appropriate protection and relief. As the case appears upon the record before us, we can only hold that the injunction granted should be permitted to stand.

Order affirmed.

We concur: Rhodes, J.; Shafter, J.; Sanderson, C. J.; Sawyer, J.