ELLEN LEAHEY vs. JOHN J. WILLIAMS.

Essex. Nov. 6, 1884; Nov. 4, 1885. — March 31, 1886.

In an action for money lent, the following facts appeared: The pastor of a Roman Catholic church borrowed money of the plaintiff, for the use of the church, upon a written contract of repayment, in the form of a deposit-book in the name of the church. The church had no corporate existence, and was incapable of making a contract. The money borrowed was mingled with the revenues of the church; and, from the fund thus constituted, the ordinary expenses of the church and sums due other similar depositors were paid, and payments were made for real estate. The defendant was the bishop of the diocese in which this church was situated, and held the legal title to all the real estate of the church. It was his duty not to permit priests to contract debts in the name or for the sake of a church without written permission. He knew that the pastor of the church in question was doing a banking business, and did not stop it, though he had the power to do so. He also knew of the manner in which the money received from depositors was mingled with the other funds of the church. Shortly before the death of a pastor of the church, the defendant received from him a large sum of money to meet the claims of depositors; and this sum was turned over to the successor of said pastor for the benefit of depositors. The defendant also raised money upon mortgages of the church property and upon his own unsecured notes for the same purpose; and subsequently transferred the real estate of the church to an ecclesiastical corporation, which afterwards became insolvent. The defendant testified, and his testimony was the only evidence in the case on the question of what the canon law was, that, under the canon law, the bishop has full power in the management of church affairs; that the diocese is the parish, and the bishop the universal parish priest; that all power possessed by priests is delegated from the bishop; that the clergyman in charge of a church has charge of all its temporalities; that it belongs to such pastor to make all contracts relating to the temporal affairs of the church, and he is not the agent or servant of the bishop in such matters; that the only control of the bishop over the pastor is by ecclesiastical discipline. *Held,* that a verdict for the plaintiff could not, upon this evidence, be sustained.

CONTRACT for money lent. Writ dated April 30, 1883. Answer, a general denial. Trial in the Superior Court, before *Bacon*, J., who allowed a bill of exceptions, in substance as follows:

It was not in dispute that the defendant became bishop of the Roman Catholic diocese of Boston in March, 1866, and archbishop of the same in March, 1875; that the Roman Catholic Church of the Immaculate Conception in Lawrence was included in said diocese, and subject to the jurisdiction of the defendant thereof in church matters until 1877; that the title

to the land upon which the said church was built, together
with the title to the land in Lawrence upon which the Orphan
Asylum was erected, were in the defendant until 1877, having
been conveyed to him by John B. Fitzpatrick, former bishop
of said diocese, by deed in fee simple, dated February 8, 1866,
and duly recorded, which deed was executed by said Fitzpatrick
through his attorney, James A. Healy; that said church was not
incorporated, and had no organization or determinate member-
ship ; and that in 1877 the defendant conveyed, by deeds duly
recorded, the said lands and church to certain members of the
Augustinian Order, a regular religious order, over which the
defendant had no control or jurisdiction.

The plaintiff introduced evidence to show that, from June
22, 1866, to December 2, 1875, inclusive, the plaintiff deposited
with the various clergymen placed in charge of said church by
the defendant up to the time of said conveyance thereof to the
Augustinians, and with clergymen thereof in charge at the time
the defendant became bishop, and for some time afterwards,
various sums of money from time to time, the first of said de-
posits being made June 1, 1866, upon the agreement and con-
ditions contained in a certain pass-book or deposit-book upon
which said deposits were entered, and entries of partial pay-
ments or withdrawals and computations of interest were made ;
that the first book upon which such deposits were made was
taken up in 1870 by one Orr, then pastor in charge of said
church, and a new one given the plaintiff in place thereof,
which new book was introduced as evidence of such deposits,
withdrawals, and computations, the last payment thereon being
a payment of interest made by said Augustinians on October 2,
1878.*

---

* This book, which was put in evidence, contained the following :

" Church of the Immaculate Conception, Lawrence.

" Rules regarding Money deposited for the use of this Church.

" 1. All money will be thankfully received for the use of this church, and
will be repaid with interest at the rate of six per cent per annum.

" 2. Interest shall be computed from the first days of January, April, July,
and October on all sums deposited on or before these days.

" 3. In computing interest round numbers only will be regarded, and no
interest will be paid for any sum less than ten dollars.

The defendant, being called as a witness by the plaintiff, testified that he held the legal title to most of the church property within his jurisdiction; that under the ecclesiastical law and usages of his Church the bishop or archbishop within his diocese has full power in the administration of church affairs, including the legislative, judicial, and executive powers; that under such law and usages there are no separate parishes in the United States; that the diocese is the parish, and the bishop or archbishop the universal parish priest; that all the power possessed by priests or pastors is delegated from the bishop or archbishop; that he was a member of the second plenary council of Roman Catholic bishops in the United States, held at Baltimore in 1866; that among the decrees made by said council for church administration and discipline were the following:

"No. 192. . . . We admonish bishops to watch lest priests by rashly building churches, or repairing them, or in any other way contracting debt, burden the property of the Church or lose credit to the dishonor of religion; hence let them demand at least yearly a financial account, and let them not permit priests to contract debt in the name or for the sake of the Church without written permission."

"No. 200. . . . But that the bishops may be able to protect themselves against undue meddling of lay tribunals which scarcely recognize the laws of the Church, nothing now is left to the bishops but to take to themselves the fullest administration of property in the presence of civil power, in order that they may

---

"4. Principal or interest, or both, shall be paid to depositors on one week's notice for every hundred dollars or fraction thereof required to be withdrawn.

"5. Any donation of the whole or part of the interest due, made to the church or asylum, will be accepted, acknowledged, and announced, same as cash donations, and will be accredited to each benefactor.

"WM. ORR, PASTOR."

The book also contained an account headed "Church of the Immaculate Conception in account with Ellen Leahey."

The account began with the item, dated January 1, 1870, "To balance principal, $450," and showed deposits in 1870, 1873, and 1875, the last item being dated December 2, 1875, of $30 deposited. It also showed on the debit side items of interest, and on the credit side items of interest withdrawn in 1872, 1875, and 1878.

provide to have all things done according to the direction of ecclesiastical laws."

The defendant further testified, among other things, that after the decree first above mentioned, so far as said church and its pastors were concerned, he lived up to the requirements of said decree, and had a yearly account of its financial condition, including debts due depositors; that he visited said church as often as once a year; that when he became bishop he took with the legal title to said church property the legal title to certain lands in said Lawrence devoted to a cemetery, in which licenses were granted for burials upon payment of license fees to the pastor; that the taxes which were assessed to him were paid by the pastor of said church, and the insurance and repairs upon said structure were paid by said pastor, all by the defendant's directions; that he knew there was no legal organization of a church, or any means of determining its membership; that when he became bishop he learned from one Taft, then the clergyman in charge of said parish, that he was carrying on the banking business and had issued deposit-books to a large amount to various depositors; that, if it had been a new question, he would not have permitted it to be carried on, but under the circumstances he thought it the best course to continue the business, until such time as to permit of the business being stopped without loss to the depositors; that he could have stopped the receipt of further deposits if he had chosen so to do, but did not think it wise under the circumstances; that a few days before Taft died, in 1868, he surrendered to the defendant what money and securities he then had, amounting to nearly $40,000, to meet the claims of depositors and others; that he gave this amount, at different times, and in sums varying from $2000 to $3000, to one Doherty, who was appointed by the defendant to succeed Taft as pastor, to meet the current demands of depositors; that, between 1868 and 1870, he raised $41,873 upon his notes secured by two mortgages, one upon said church property and the other upon another piece of church property in South Lawrence, to meet the current demands of the depositors, over and beyond the current supply, and thereafter raised, at three different dates between said years, the sum of $8000 upon his unsecured notes, and paid this sum, together with said $41,873, to said depositors as they demanded it, by and

through Doherty; that when one Orr, who was appointed by the defendant to succeed Doherty, left said pastorate, the amount due depositors aggregated $175,000, and remained about the same down to the date of the transfer of all said church property to said Augustinian Society, which became insolvent in 1883; that the amount due depositors from the time he became bishop very largely exceeded in value the entire church property, which was heavily encumbered with mortgages; that he knew this banking business was carried on in a building connected with the church, and which was part of the church property; that in 1870 Orr bought a valuable piece of land on Union Street in said Lawrence, and built thereon a church edifice, and that he thought some of the deposits at said church went into this Union Street property, the legal title to which was transferred to the defendant in 1872 by Orr, after the construction of said edifice, by deed in common form, and by deed in common form was transferred in 1877 by the defendant to John P. Gilmore, one of said Augustinians; that he knew Doherty and Orr continued the banking business upon a large scale; that he thought he did not give them written permission so to do, as provided in said decree No. 192, but should have had no hesitation in so doing had he been asked so to do; that he knew the funds received from time to time from various depositors were kept mingled with the revenues of the church, and that out of this common fund were paid all kinds of debts connected with the administration of said church; that he, the defendant, furnished of his own personal funds $20,000, for the construction in part of said Union Street edifice.

Upon cross-examination, the plaintiff testified that William Orr, one of said clergymen, received deposits, in 1870, from the plaintiff in pursuance of said system, which deposits the defendant and the plaintiff regarded as forming part of the indebtedness of said Church of the Immaculate Conception, and which were entered upon said book, the same being issued to the plaintiff on January 1, 1870, by Orr, and that Orr announced from the pulpit of said church, prior to 1873, to the congregation thereof, of which the plaintiff was a member, that such deposits would be received, and that the same would be done by permission of the defendant.

The plaintiff further testified, on cross-examination, that, when she made the deposits with Orr, she expected the bishop of Boston would be liable for the money, and deposited $300 after said announcement; that she remembered no conversation with the said clergymen as to the liability or responsibility of the defendant; that she saw and read the conditions of deposits on both her books, and assented to the same; that she understood the money so deposited was for the use of said church, and no other church; that she never looked to the defendant for payment of this claim until said Augustinians were in financial trouble in 1883; that Orr did not in his said announcement in church say that the defendant would be responsible for such deposits; that she knew from what she heard and read that said church and asylum had been transferred by the defendant to said Augustinians, in 1877; that she deposited $30 with said Augustinians, after such transfer, which deposit was indorsed on said book; that said indorsement of interest in 1878 was made by one of said order, and accepted by her; that she filed a claim against the Augustinian Society, the same being a corporation under the laws of Massachusetts, in 1883, when proceedings in insolvency were pending against them in the Court of Insolvency for said county; that she originally brought this suit against said corporation, and this defendant; but had since discontinued as against said corporation, and that this suit was brought before said proceedings in insolvency were commenced.

The defendant then put in evidence the power of attorney, duly recorded, from Fitzpatrick to said Healy, under which the said conveyances were made to the defendant, in which power of attorney it was expressed that said Fitzpatrick held the property "for ecclesiastical purposes," and that said Healy was authorized to convey the same to the defendant to hold for the same purposes.

The defendant testified, on cross-examination, that under the canon law and the decrees of the plenary council of the Catholic Church holden at Baltimore in 1866, he held the Church of the Immaculate Conception in Lawrence, until he conveyed the same to said Augustinians, in trust for the Catholic congregation of said church for ecclesiastical purposes and public worship in the Roman Catholic form, though apparently by an absolute title

of record; that he could not convey or dispose of the same for his own personal benefit, or apply the money arising from the sale of the same to his personal use; that the money deposited by the plaintiff had all been deposited for the use of said church, and that none of the same had been used or received by the defendant; that the system of receiving deposits was in practice before and at the time when he became bishop; that the clergyman in charge of a church for the time being had charge of all its temporalities; that he had never authorized said money to be borrowed on his personal credit, or acknowledged that the same was so borrowed, or agreed to be responsible for the same, and that his only control over the clergy of the diocese was by ecclesiastical discipline, and that he could not remove them from their parishes except for cause, and by ecclesiastical discipline.

The defendant further testified, on cross-examination, that in some of the deposit-books issued by the clergyman preceding said Orr, who was placed in charge of said church in 1869, there was something said about such deposits being a lien on said church, or something of that kind; that he did not know that Orr in 1870 called in the deposit-books and substituted new ones therefor; that he did not remember any conversation with said Orr about said deposits; that it belonged to the pastor in charge of such church to make all contracts relating to the temporal affairs of the same, and that they were not his agents or servants in such matters under the canon law; that he had never received a cent of said deposit; and that, though not so expressed in writing, he conveyed said church and asylum to said Augustinians upon the agreement that they should assume and pay the debt thereof, including said deposits, and that said church had been held and used since 1866 for purposes of public worship. In all of this evidence the defendant was uncontradicted. The defendant testified, on re-direct examination, that the question of his responsibility for deposits was never discussed one way or the other.

Orr testified that, in receiving deposits, he had never expressly pledged the credit of the defendant, or stated that the defendant was liable or responsible, and that parties depositing were always informed upon just what conditions their deposits were received.

Daniel D. Reagan, a member of said order, testified that the Augustinians continued to receive deposits after the conveyance from the defendant to them; that the Augustinian Society never pledged or had any power to pledge the credit of the defendant, and that they assumed the whole indebtedness of the Church of the Immaculate Conception, at the time the same was conveyed to them by the defendant, and that said corporation was not subject to the control of the defendant.

At the close of the evidence, the plaintiff waived her claim to recover said sum of $30 in this action.

Upon the foregoing testimony, the same being all the evidence material to the questions raised and the instructions prayed for thereon, the plaintiff contended that the defendant was liable as the principal for whom the money in suit had been borrowed by his agents.

The defendant, among other requests for instructions which need not now be stated, asked the judge to instruct the jury that, upon said evidence, the plaintiff had shown no case against the defendant, and that they must return a verdict for the defendant. The judge refused so to instruct the jury; but did instruct them, that, if the defendant borrowed the money by his agents and put the same into real estate, it was immaterial whether the said real estate was held by the defendant in trust, or absolutely in his individual capacity.

The judge also instructed the jury, that agency could not be established by the declarations of one claiming to be an agent, and gave full instructions upon the law of agency and the other questions arising in the case, to which no objections were made, except as herein expressed.

The jury returned a verdict for the plaintiff; and the defendant alleged exceptions.

The case was argued at the bar in November, 1884, and was reargued in November, 1885.

*W. Gaston & T. J. Gargan*, for the defendant, cited, among other cases, *Rose* v. *Vertin*, 46 Mich. 457; *O'Hara* v. *Stack*, 90 Penn. St. 477, 491; *Twigg* v. *Sheehan*, 101 Penn. St. 363.

*E. T. Burley*, for the plaintiff. 1. The question of the defendant's liability rested mainly upon his testimony, and it was within the province of the jury to weigh it in the light of his

interest in the case.  In simple contracts in writing, other than negotiable instruments, a liberal doctrine now obtains, and parol evidence may be relied upon to disclose the real parties to the contract.  Story on Agency, (9th ed.) § 160 *a*, and cases cited. *Lerned* v. *Johns*, 9 Allen, 419.  *Bowen* v. *Proprietors of the South Building*, 137 Mass. 274.

It is submitted that, upon all the evidence, the jury were warranted in finding that, in receiving the deposits and issuing the deposit-book, Orr was acting as the authorized agent of the defendant, who was carrying on a banking business under the name of the " Church of the Immaculate Conception."    *Fuller* v. *Hooper*, 3 Gray, 334, 340.  *Eastern Railroad* v. *Benedict*, 5 Gray, 561.  *Goodenough* v. *Thayer*, 132 Mass. 152.  *Bryant* v. *Eastman*, 7 Cush. 111, 113.  *Charman* v. *Henshaw*, 15 Gray, 293.  *Arnold* v. *Spurr*, 130 Mass. 347.  *Newman* v. *British & North American Steamship Co.* 113 Mass. 362.  1 Perry on Trusts, § 404.

Agency was disclosed by the contract itself ; and the character of the agency by the declarations of the agent publicly made before 1873, as appeared by the cross-examination of the plaintiff.    The account purports to be a debit and credit account between the Church of the Immaculate Conception and the plaintiff.    But the " church " was not incorporated, had no organization of any kind, and no determinate membership.    The most that can be claimed for this " church " is, that it was a building, or meeting-house, devoted to religious worship, and resorted to by such men, women, and children as chose to attend religious services therein, either permanently or temporarily ; and unless this contract is binding upon the defendant, it would seem that no party is bound by it.    Not a church or religious society, because there was no church organization, nor even a voluntary association.    Not the pastor, in contract, because he disclosed his agency, and was not a contracting party under the form of the contract as executed.    *Abbey* v. *Chase*, 6 Cush. 54. Not the pastor, in tort, because he was in fact the authorized agent of the defendant, disclosed himself as such agent, and did not falsely assume authority.    *Bartlett* v. *Tucker*, 104 Mass. 336.

The other evidence in the case cannot be controlled by the defendant's testimony that he never expressly authorized his personal credit to be given.    And still less is it to be affected

by the defendant's opinion of agency under the canon law. *Roche* v. *Ladd*, 1 Allen, 436. *Fay* v. *Richmond*, 43 Vt. 25. *Matteson* v. *Blackmer*, 46 Mich. 393.

The question of personal credit "was never discussed, one way or the other." The question here raised is not one of the weight of the evidence, but whether there was any evidence to authorize the verdict.

2. This action is brought against the defendant as an individual, and not as trustee or bishop. The question here is one of contract, not of title. It was correctly ruled at the trial, that, if the defendant made the contract, it was immaterial whether he held the real estate absolutely or in trust. The trust, if any, was *in foro conscientiæ* only, and could not be enforced in any proceeding. *Hennessey* v. *Walsh*, 55 N. H. 515.

3. The cases of *Rose* v. *Vertin*, 46 Mich. 457, *Stack* v. *O'Hara*, 98 Penn. St. 213, 232, and *Twigg* v. *Sheehan*, 101 Penn. St. 363, have no application to the facts of this case. The question here is, not what was the legal relation of bishop and priest, as between themselves, in administering the affairs of a church, but what was their legal relation as to third persons while carrying on the secular business of banking.

W. ALLEN, J. The Church of the Immaculate Conception was a Roman Catholic church belonging to the diocese of Boston. The defendant was the bishop of the diocese, and held the title to the real estate used for the church.

The pastors of the church borrowed money of the plaintiff, and of many other persons, for the use of the church, upon written contracts of repayment in the form of deposit-books in the name of the church. As the church had no corporate existence, and was incapable of contracting or of holding property, there was no validity in the contracts as between it and the plaintiff. The plaintiff's case is, that the defendant is the principal, on whose credit the pastors borrowed the money. The only exception we need consider is that to the refusal of the court to rule that the evidence was not sufficient to charge the defendant.

The evidence was undisputed, that the money received from the depositors was mingled with the revenues of the church, and went to constitute a common fund, out of which were paid the

ordinary expenses of the church, debts of the church, including payments to depositors, and payments for real estate.

The defendant, in accordance with the usages of the Roman Catholic Church in this country, held the legal title to all the real estate of the church. The court properly instructed the jury, that, if the defendant borrowed the money by his agents, and put it into real estate, it was immaterial whether such real estate was held by him in trust, or as his individual property. No inference, however, that the money deposited belonged to the defendant can be drawn from the fact that the pastors applied a portion of it to the purchase of real estate for the church, the legal title of which was put in the defendant. There was no evidence that the defendant had any connection with the real estate, or with the moneys deposited by the plaintiff or others, except what arose from his relations to the church and its pastors as their bishop. There was no express authority given by him to the pastors to borrow the money on his credit, and all his acts in relation to it are properly referable to his official character as bishop.

The argument is, that the pastor of a Roman Catholic church exercises, in regard to the church over which he is placed, only the delegated authority of the bishop, and acts only as agent of the bishop; and therefore that those transactions are to be regarded as made by the bishop himself. Assuming, without deciding, that in such case the bishop would be personally liable on the contracts made by the pastor in the name of his church, we do not think that there was evidence in this case to prove that the pastor of a Roman Catholic church is, in regard to the pecuniary affairs of his church, the agent of the bishop, exercising for him rights belonging to him. The legal rights of the bishop in regard to the temporalities of a church are not prescribed by the municipal law, and must arise, if at all, from the relations created by ecclesiastical law. What that law is was matter of evidence, and could be known only by the very meagre and general reference to it in the evidence. The testimony of the defendant, the only witness to it, that, under the canon law, which is the law of the Roman Catholic Church, the bishop has full power in the administration of church affairs; that there are no separate parishes; that the diocese is the parish, and the

bishop the universal parish priest; that all power possessed by priests or pastors is delegated from the bishop; that the clergyman in charge of a church for the time being has charge of all its temporalities; that it belongs to such pastor to make all contracts relating to the temporal affairs of the church, and he is not the agent or servant of the bishop in such matters; that the only control of the bishop over the pastor is by ecclesiastical discipline; and that a bishop cannot remove a priest except for cause, and by ecclesiastical discipline, — will not permit an inference that the legal possession and control of the temporalities of a church, and the right of making contracts in regard to them, are vested in the bishop, and can be exercised only by him personally, or by his agent.

The decrees of council put in evidence do not afford a different conclusion. The supervision required of the bishop over the contracting of debts by priests does not appear to be the supervision of a legal principal over his agent, but of an ecclesiastical superior over the conduct of his subordinate, and the debts which a bishop is forbidden to allow a priest to contract without written permission do not appear to be the debts of the bishop himself. It is in accordance with the decree that bishops acquire a title to the real estate of the churches, but they do not derive title from it. The authority which the bishops delegate to the priests must be authority vested in them under ecclesiastical law, and *prima facie* is ecclesiastical authority, and must be presumed to be so, in the absence of all evidence to the contrary.

It being a rule of the ecclesiastical law, to which the church was subject, that a pastor shall not contract debts in the name or for the sake of his church without the written permission of the bishop, such written permission cannot be evidence that debts contracted under it are the legal debts of the bishop. Nor can the fact that, after such debts are contracted in the name of the church, the bishop procures money for paying them by mortgaging the real estate of the church of which he has the legal title, and on his personal security, be sufficient to prove that he is under a legal liability to pay them; nor the fact that a bishop receives from a dying pastor funds of the church, which are paid over to the pastor's successor, be sufficient evidence that the funds belong to the bishop.

It is argued that the defendant must be liable, because, if he is not the party to the contract, there can be no contract and no legal liability. The questions whether any one other than the defendant is liable on the contract, or whether, if there be no contract, any one is liable to the plaintiff in tort, or whether the only remedy of the plaintiff is against the fund, are not before us. It cannot be assumed that the plaintiff could not have given credit to the fund. The fund would have been the ultimate resort for payment, had the church been incorporated under the statute, or had the deposits been in an incorporated savings bank; and it is not necessary that there should have been any personal liability on the contract in order that there should be a remedy against the fund.

But these questions need not be discussed. In order to charge the defendant, it must be shown that he is liable on the contract; it is not sufficient that no one else is a promisor on it. We think that the evidence was not sufficient to hold the defendant, and that the instructions asked to that effect should have been given.                                   *Exceptions sustained.*