[S. F. Nos. 18230, 18231. In Bank. June 1, 1951.]

CLINTON MALLOY, a Minor, etc., Appellant, v. WILLIAM PETER FONG et al., Respondents.

M. Mitchell Bourquin, Healy & Walcom, Jacobs, Blancken-
burg & May and John J. Healy for Appellant.

Clarence A. Linn, Robert W. MacDonald, Dan · Hadsell,
Roscoe D. Jones, Raymond L. Hanson, Cooley, Crowley &
Gaither and Louis V. Crowley for Respondents.

Raymond L. Hanson and Albert C. Agnew as Amici Curiae
on behalf of Respondents.

TRAYNOR, J.—Plaintiff brought this action for damages
for personal injuries allegedly caused by the concurrent neg-
ligence of defendants Holmes, Fong, and Antisdale. Plain-
tiff alleged that Fong and Antisdale were acting as agents
of defendant Presbytery of San Francisco. The jury exoner-
ated defendant Holmes, but returned a verdict in favor of
plaintiff in the amount of $41,500 against defendants Fong,
Antisdale, and the Presbytery of San Francisco. On motion
of defendant Presbytery, the trial court entered a judgment
notwithstanding the verdict as to it. Defendant Antisdale's
motion for new trial was granted. Defendant Fong's motion
for judgment notwithstanding the verdict was denied. Plain-
tiff appeals from the order granting a new trial as to defend-
ant Antisdale and from that part of the judgment that denies
recovery against the Presbytery. Defendant Fong has not
appealed.

During the summer vacation of 1943, plaintiff, then a boy of
13, attended a vacation Bible school conducted at the San
Mateo Presbyterian Church for the children of members of
the church, then a "mission" under the jurisdiction of de-

fendant Presbytery of San Francisco. Defendant Antisdale, pastor of the church, was in charge of the school and gave the Bible instruction. The Bible classes were supplemented by classes in arts and crafts and by supervised recreation at a nearby playground to which the children were taken in automobiles and from which they were returned to the church at the conclusion of the recreation period.

Antisdale became ill several days before July 1, 1943, the day plaintiff was injured, and was unable to conduct the school. It was therefore left without effective supervision and without an instructor qualified to conduct the Bible classes. Defendant Fong, a 19-year-old divinity student, was at that time vacationing at the home of his guardian, Dr. Jones, a retired Presbyterian minister, in San Mateo. Fong agreed to conduct the Bible instruction in Antisdale's absence so that Antisdale might stay home and rest. In addition to conducting the Bible classes, Fong drove the children to the playground for their recreation period in his guardian's automobile, a Ford station wagon lent to him for that purpose.

Antisdale returned to the church on the day of the accident, but he was occupied in his office the greater part of the morning, and Fong remained in charge of the class. At the conclusion of the Bible instruction, Fong released the children to wait outside the church for transportation to the playground for the recreation period. Antisdale emerged from his office to see the children climbing into Fong's station wagon and several boys, including plaintiff, standing on the running boards. Antisdale then informed the children that he would take some of them in his car to relieve the congestion in the station wagon, and several of them entered the back seat of his car. Two of the boys left Fong's station wagon and stood on the running boards of Antisdale's car. The other children remained in Fong's station wagon, plaintiff standing on the left running board and another boy standing on the right running board. Antisdale testified that he ordered the children off the running boards. It is undisputed, however, that Antisdale did not insist on compliance with his order and that the children continued to stand on the running boards of his car and Fong's.

The church was located on Twenty-fifth Avenue in San Mateo, a street running east and west; the playground to which the children were being taken was located on Twenty-eighth Avenue, several blocks west of the church. Twenty-eighth Avenue is intersected east of the playground by Isabelle

Avenue, a street running north and south. The two vehicles left for the playground, driving west on Twenty-fifth Avenue, Antisdale's car in the lead, closely followed by Fong's station wagon. They then turned south to Twenty-eighth Avenue and again headed west toward the playground. During the trip the children in each vehicle were shouting and challenging the children in the other vehicle to a race to the playground. Although the evidence is conflicting on this point, there is testimony that Fong and Antisdale entered into the spirit of the competition and increased the speed of their vehicles. After the vehicles turned west on Twenty-eighth Avenue, Fong pulled out to the left and endeavored to pass Antisdale, who increased the speed of his car to prevent Fong from passing. Fong pulled up parallel to Antisdale but was unable to pass him because Antisdale had increased his speed. Twenty-eighth Avenue has only one lane for vehicular traffic proceeding in each direction, so that Fong's station wagon during the time he was attempting to pass Antisdale was being driven well over in the left-hand lane, almost to the opposite curb. The two vehicles approached the intersection of Twenty-eighth and Isabelle Avenues in that position, Fong still unsuccessfully attempting to pass Antisdale. Antisdale stopped his car at the intersection, but Fong proceeded out into the intersection at an excessive rate of speed, still on the left-hand side of the road. Defendant Holmes was driving her car north on Isabelle Avenue and had just pulled out into the intersection when Fong drove by her. The vehicles were too close for her to stop in time and, according to her testimony, Fong made no effort to stop. Her right front fender and Fong's station wagon collided, striking plaintiff standing on the left running board. As a result of the collision, plaintiff lost his left leg below the knee and sustained injuries of a permanently disabling nature to his right leg, necessitating prolonged hospitalization and medical treatment.

Plaintiff's complaint was in three counts. In the first count he alleged that Fong was the agent of Antisdale and the Presbytery, that he was a passenger in Fong's car at the time of the accident, and that the accident was caused by the concurrent negligence of defendants Fong and Holmes. In the second count he alleged that Antisdale was the agent of the Presbytery, and that his negligence was a cause of the injuries to plaintiff in that he "negligently and carelessly increased the speed of his said Chevrolet sedan automobile, so as to render it impossible for said Ford Station Wagon [driven

by Fong], in which plaintiff was riding, to pass and return to the right side of the roadway, so that the two (2) vehicles ran abreast into the intersection of said 28th Avenue with Isabelle Avenue, proximately causing and precipitating a collision between said Ford Station Wagon in which plaintiff was riding and that said Chevrolet sedan automobile being driven by defendant Eleanor Holmes." In the third count, plaintiff alleged that Antisdale and Fong were negligent in failing to exercise proper care for the safety of the children for whom they were responsible in that they negligently permitted several of them, including plaintiff, to ride on the running boards of the two vehicles, and that such negligence was a proximate cause of plaintiff's injuries.

Defendants Antisdale, Fong, and Holmes answered, denying negligence and pleading that plaintiff was contributively negligent. Defendant Presbytery denied that Fong was the agent of Antisdale, or that either of them was its agent, or that plaintiff was a passenger in Fong's station wagon. It pleaded three defenses: (1) that plaintiff was contributively negligent; (2) that the sole cause of the accident was the negligence of defendant Holmes; and (3) that it is a charitable corporation, engaged solely in the propagation of religion and "does not contemplate the distribution of gains, profits or dividends to its members, and that at no time has it engaged in any activity other than the propagation of religion. That this defendant has at all times exercised due and reasonable care in the selection of its servants and agents."

Plaintiff contends that there is substantial evidence to support the verdict of the jury, that there were neither errors of law nor irregularity in the proceedings at the trial, and that the trial court improperly granted defendants' motions for judgment notwithstanding the verdict and for a new trial. In support of the judgment notwithstanding the verdict, the Presbytery contends that, as a charitable corporation, it is not liable to nonpaying beneficiaries for the torts of its agents, and that, as a matter of law, neither Fong nor Antisdale were its agents at the time of the accident. In support of the order granting a new trial, Antisdale contends that the trial court committed error in the giving of two instructions: one, that the jury could find against Antisdale if they found that Fong was his agent and was negligent; the other, that a verdict might be returned against Fong and against Antisdale as his principal, even though the jury found Fong guilty only

of ordinary or gross negligence, if it also found that plaintiff was a passenger and not a guest in Fong's station wagon. Antisdale contends that, as a matter of law, Fong was not his agent and plaintiff was a guest in Fong's station wagon, and that the instructions were therefore prejudicially erroneous in that they submitted to the jury as a question of fact a matter that was one of law and "at the least *permitted* the jury to find such a relation" when in fact none existed. (*Edwards* v. *Freeman,* 34 Cal.2d 589, 594 [212 P.2d 883].)

### Plaintiff's Appeal from the Judgment for the Presbytery of San Francisco

The Presbytery contends that, as a charitable corporation, it is exempted from liability to nonpaying beneficiaries by the holding of this court in *Thomas* v. *German General Benevolent Society,* 168 Cal. 183, 188 [141 P. 1186], that "where one accepts the benefit of a public or a private charity he exempts by implied contract the benefactor from liability for the negligence of the servants in administering the charity, if the benefactor has used due care in the selection of those servants." (*Lewis* v. *Young Men's Christian Assn.,* 206 Cal. 115, 116 [273 P. 580]; *Bardinelli* v. *Church of All Nations,* 23 Cal.App.2d 713, 714-715 [73 P.2d 1264]; *Young* v. *Boy Scouts of America,* 9 Cal.App.2d 760, 764 [51 P.2d 191]; *Ritchie* v. *Long Beach Com. Hospital Assn.,* 139 Cal. App. 688, 690 [34 P.2d 771]; *Stonaker* v. *Big Sisters Hospital,* 116 Cal.App. 375, 379 [2 P.2d 520]; *Hallinan* v. *Prindle,* 17 Cal.App.2d 656, 669 [62 P.2d 1075]; *Shane* v. *Hospital of the Good Samaritan,* 2 Cal.App.2d 334, 335-340 [37 P.2d 1066]; cf. *Phoenix Assurance Co.* v. *Salvation Army,* 83 Cal.App. 455, 456, 461-462 [256 P. 1106].)

The theory of the Thomas case, however, was abandoned by this court in *Silva* v. *Providence Hospital,* 14 Cal.2d 762, 775 [97 P.2d 798], and *England* v. *Hospital of the Good Samaritan,* 14 Cal.2d 791 [97 P.2d 813], for the reason that "the implied contract doctrine has been used to rationalize a result and is not based upon the intention of the parties, as legal principle requires." Those cases held that a charitable hospital was liable to a paying patient for injuries resulting from the negligence of a nurse.

The Presbytery contends that the Silva and England cases are limited to the facts presented therein and do not require the complete abandonment of the doctrine of charitable immunity. It contends that, since the plaintiffs in those cases

were paying patients of the defendant hospitals, the decisions therein state a rule applicable only to paying beneficiaries of the activities of charitable corporations. It is contended that as to nonpaying recipients of charity the rule of the Thomas case is still applicable.

It is true, as the Presbytery asserts, that the plaintiffs in the Silva and England cases paid for the services they received. It does not follow, however, that the reasoning applied in those cases is limited to paying beneficiaries. The theories advanced by the earlier decisions or urged by the Presbytery in support of the partial retention of the doctrine of charitable immunity are as applicable to paying beneficiaries as to those who do not pay. If the theories discussed and discarded by this court in the Silva and England cases do not justify immunity from liability in the case of a paying beneficiary, there is no logical justification for clinging to them in the case of the beneficiary who does not pay. (*Mulliner* v. *Evangelischer Diakonniessenverein,* 144 Minn. 392, 397, 398 [175 N.W. 699]; *Sheehan* v. *North Country Com. Hospital,* 273 N.Y. 163, 166 [7 N.E.2d 28, 109 A.L.R. 1197]; *Dillon* v. *Rockaway Beach Hospital,* 284 N.Y. 176, 180 [30 N.E.2d 373]; *Hewett* v. *Woman's Hospital Aid Assn.,* 73 N.H. 556, 564 [64 A. 190, 7 L.R.A.N.S. 496]; *Foster* v. *Roman Catholic Diocese of Vermont,* —— Vt. —— [70 A.2d 230, 234-235]; see 28 Cal.L.Rev. 530, 533.)

"Abolition of the immunity as to the paying patient is justified as the last short step but one to extinction. Retention for the nonpaying patient is the least defensible and most unfortunate of the distinction's refinements. He, least of all, is able to bear the burden. More than all others, he has no choice. He is the last person the donor would wish to go without indemnity. With everyone else protected, the additional burden of protecting him cannot break the trust. He should be the first to have reparation, not last and least among those who receive it. So stripped of foundation, the distinction falls. It should fall in line with, not away from, the trend which has brought it about. The immunity should go and the object of the charity should be placed on a par with all others." (Rutledge, J., in *President & Directors of Georgetown College* v. *Hughes,* 130 F.2d 810, 827.)

The Presbytery asserts that this court adopted a distinction based on payment in *Humphreys* v. *San Francisco Area Council,* 22 Cal.2d 436 [139 P.2d 941]. It misconstrues that decision. A judgment for defendant was there affirmed

on the ground, not that it was a charity and therefore immune, but that the plaintiff had given no compensation for the ride he received in the vehicle in which he was injured and was, therefore, under Vehicle Code section 403, a guest not entitled to recover in the absence of wilful misconduct or intoxication on the part of the driver. This court did not pass upon the extent of defendant's liability as a charitable corporation for the reason that under section 403 no actionable wrong had been committed. (22 Cal.2d 436, 443-444; see, also, *Edwards v. Hollywood Canteen,* 27 Cal.2d 802, 812 [167 P.2d 729].)

The Presbytery contends that public policy requires the preservation of its immunity from liability for torts committed by its agents on nonpaying beneficiaries of its charity. The declared public policy of this state, however, is contrary to that view: "Everyone is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person. . . ." (Civ. Code, § 1714.) That policy admits of no exception based upon the objectives, however laudable, of the tort feasor. (See, also, *Mulliner* v. *Evangelischer Diakonniessenverein,* 144 Minn. 392, 398 [175 N.W. 699].) As was said in the Silva case, *supra:* "[N]o one is obliged by law to assist a stranger, even though he can do so by a mere word, and without the slightest danger to himself. However, once he has undertaken to render assistance the law imposes upon him a duty of care toward the person assisted. (Restatement of Law of Torts, § 324; *McLeod* v. *Rawson,* 215 Mass. 257 [102 N.E. 429, 46 L.R.A.N.S. 547] ; *Hoyt* v. *Tilton,* 81 N.H. 477 [128 A. 688]. . . . Professor Harper, in his book, 'The Law of Torts,' points out that 'the immunity of charitable corporations in tort is based upon very dubious grounds.' Continuing, he concludes: 'It would seem that a sound social policy ought, in fact, to require such organizations to make just compensation for harm legally caused by their activities under the same circumstances as individuals before they carry on their charitable activities. The policy of the law requiring individuals to be just before generous seems equally applicable to charitable corporations. To require an injured individual to forego compensation for harm when he is otherwise entitled thereto, because the injury was committed by the servants of a charity, is to require him to make an unreasonable contribution to the charity, against his will, and a rule of law imposing such burdens can not be regarded as socially desirable nor consistent with sound

policy.' (Sec. 294.)'' (*Silva* v. *Providence Hospital,* 14 Cal.2d 762, 775 [97 P.2d 798].) ''The incorporated charity should respond as do private individuals, business corporations and others, when it does good in the wrong way.'' (*President & Directors of Georgetown College* v. *Hughes, supra,* 130 F.2d 810, 828.) The dictum in *Thomas* v. *German General Benevolent Society,* 168 Cal. 183, 188 [141 P. 1186], and the decisions following it are disapproved.

█ It has been suggested that plaintiff in effect paid for the services rendered by the Daily Vacation Bible School, inasmuch as his parents made contributions for the support of the school. These contributions, however, were voluntary and anonymous and unlike the scheduled charges for medical and hospital care that were paid by the plaintiffs in the Silva and England cases. It is not certain, therefore, that plaintiff could qualify as a ''paying beneficiary'' of the charity in this case. In any event, a consideration of this question is not necessary in view of our decision that charitable corporations are liable for their torts whether or not a particular plaintiff has paid for the charity received.

The Presbytery next contends that Antisdale and Fong were not agents of the Presbytery.

█ The evidence introduced at the trial shows that the Presbyterian denomination in this country is an integrated ecclesiastical organization. There are four principal levels of authority: the General Assembly, the Synods, the Presbyteries, and the local churches or ''Sessions.'' As the name ''Presbyterian'' suggests, the Presbytery is a vital unit of this organization, and it has extensive powers of control over the churches within its jurisdiction. In practice, such power is seldom exercised over firmly established, thriving congregations, but there are at least three situations where this authority is of great importance: (1) before a local church is fully established, missionary activities are conducted by the Presbytery; (2) when a church becomes too large, the Presbytery supervises its division into smaller churches and has the power to apportion property among them (see *Wheelock* v. *First Presbyterian Church of Los Angeles,* 119 Cal. 477, 482 [51 P. 841]); (3) in a declining neighborhood, when a church is no longer able to function successfully by itself, the Presbytery takes over (see *Tabor Presbyterian Church Dissolution Case,* 347 Pa. 263 [32 A.2d 196]).

Plaintiff contends that at the time of the accident the

San Mateo Presbyterian Church was in the "mission" stage, that the Presbytery was therefore directly engaged in promoting Presbyterianism in that area, and that the Daily Vacation Bible School was an integral part of this activity by the Presbytery. Early in the trial this issue was emphasized by comments of the trial court to the jury; the jurors were expressly told to look for the degree to which the Presbytery conducted the social and recreational activities of the San Mateo Church. "In other words, if those matters were left to the local church to be solved and were controlled by the local organization, then the Presbytery wouldn't be involved." The verdict against the Presbytery necessarily involves a finding by the jury that these matters were not left to the local church. This finding is sufficiently supported by evidence that the San Mateo Church was in an embryonic stage at the time of the accident and that, in view of that fact, its activities were conducted by the Presbytery.

The missionary character of the local church is suggested by the fact that its property was held by the Presbytery. The Presbytery held the lease for the building where the services and Bible classes were conducted. The rental on this building was nominally paid by the church, but for most of this amount it received a monthly subsidy from the War Emergency Fund of the national Presbyterian organization. Not until after the incorporation of the church in 1945, almost two years after the accident, did the Presbytery convey to the church other land on which the present edifice is located. The San Mateo church did not pay all of Antisdale's salary; it received a monthly subsidy for this purpose from the National Board of Missions.

Antisdale himself testified that the church was in an embryonic stage and was considered a mission church. Later, following a recess at the trial, he testified that he did not know what the technical definition of a mission church is, that "I believe it must be one that is solely supported by the National Mission Board, and I do not think it could quite qualify as that." Whether or not the church was a mission in a technical ecclesiastical sense, the fact that it was considered a mission church attests strongly to its embryonic character and indicates that there was a close working relationship between the church and the Presbytery.

The Presbytery had the power to approve or disapprove Antisdale's selection as minister. Following his installation in that office by the Presbytery, he was not responsible

to the local church but only to the Presbytery. The Presbytery, not the church, had the power to remove him. Furthermore, he could not transfer to another pastorate without the permission of the Presbytery, and in fact he was a member of the Presbytery rather than of the local church.

As the judicatory in charge of all Presbyterian churches in the San Francisco Bay area, the Presbytery of San Francisco had primary responsibility for the extension of the Presbyterian movement into new localities in that region. It was the Presbytery that organized the San Mateo group in 1942 and undertook the task of transforming it into a full-fledged church. During this early period, the Presbytery not only held the church property but was in charge of church activities. Speaking of churches in the mission stage, an officer of the defendant Presbytery testified: "that really is the place where the presbytery does exercise control." The establishment and maintenance of religious education for children was an important part of the Presbytery's project in San Mateo. The jury could properly conclude, therefore, that the agents who conducted the Daily Vacation Bible School were the agents of the Presbytery.

It bears emphasis that we are not here called upon to determine the liability of the Presbytery for negligence in the activities of a fully established and independently incorporated Presbyterian church which has passed the mission stage.

The Presbytery has cited a number of decisions in other states to the effect that bishops and similar ecclesiastical bodies are not liable for the torts of local ministers. None of these cases involved supervision of a mission church. Furthermore, some were contract actions and turned upon specific findings that the act of the subordinate was beyond his contractual authority (*Leahey* v. *Williams*, 141 Mass. 345, 355-357 [6 N.E. 78] ; *Davidsville First National Bank* v. *St. John's Church*, 296 Pa. 467, 472 [146 A. 102] ), or that an alleged agency by estoppel had not been proved (*Reifsnyder* v. *Dougherty*, 301 Pa. 328, 333-334 [152 A. 98] ). In *Carini* v. *Beaven*, 219 Mass. 117 [106 N.E. 589, L.R.A. 1915B 825], the plaintiff did not rely upon the doctrine of *respondeat superior* but alleged the violation of a duty owed directly by the defendant bishop; the case turned solely on principles of negligence and proximate cause. In *Magnuson* v. *O'Dea*, 75 Wash. 574 [135 P. 640, Ann.Cas. 1915B 1230, 48 L.R.A.N.S. 327], the appeal did not concern the bishop as a bishop, but as an individual, and involved allegations that he had himself

participated in the tortious conduct. The action of the trial court in dismissing the suit as to the bishop in his corporate capacity was not discussed on appeal, but it is significant that under local decisions the doctrine of charitable immunity was applicable. (*Richardson* v. *Carbon Hill Coal Co.*, 10 Wash. 648, 655 [39 P. 95]; *Tribble* v. *Missionary Sisters of Sacred Heart*, 137 Wash. 326, 329-330 [242 P. 372].) ▮ Once the claim of charitable immunity is rejected, there is no compelling reason for not applying the rule of *respondeat superior* to ecclesiastical bodies as it applies to other employers.

The Presbytery contends that even if Antisdale was engaged in work for the Presbytery, he was an independent contractor for whose negligence the Presbytery was not responsible.

▮ Whether a person performing work for another is an agent or an independent contractor depends primarily upon whether the one for whom the work is done has the legal right to control the activities of the alleged agent. (*Edwards* v. *Freeman*, 34 Cal.2d 589, 592, 593 [212 P.2d 883]; *Empire Star Mines Co.* v. *California Emp. Com.*, 28 Cal.2d 33, 43 [168 P.2d 686].) ▮ The power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities. "The right to immediately discharge involves the right of control." (*Riskin* v. *Industrial Acc. Com.*, 23 Cal.2d 248, 253, 255 [144 P.2d 16]; *Ryan* v. *Farrell*, 208 Cal. 200, 202-203 [280 P. 945]; *Western Metal Supply Co.* v. *Pillsbury*, 172 Cal. 407, 417 [156 P. 491, Ann.Cas. 1917E 390]; *Chapman* v. *Edwards*, 133 Cal.App. 72, 77, 79 [24 P.2d 211]; *Yucaipa Farmers Cooperative Assn.* v. *Industrial Acc. Com.*, 55 Cal.App.2d 234, 237 [130 P.2d 146].) ▮ It is not essential that the right of control be exercised or that there be actual supervision of the work of the agent. The existence of the right of control and supervision establishes the existence of an agency relationship. (*Empire Star Mines Co.* v. *California Emp. Com.*, 28 Cal.2d 33, 43 [168 P.2d 686].) ▮ The evidence clearly supports the conclusion of the jury that such control existed in the present case. The right of the Presbytery to install and remove its ministers, to approve or disapprove their transfer to other jurisdictions, and to supervise and control the activities of the local churches, particularly those in the mission stage, is inconsistent with a contrary conclusion.

▮ Other tests are sometimes invoked, in addition to the power of control, in determining whether one is an agent.

They reinforce the conclusion that Antisdale was an agent and not an independent contractor. As listed in *Empire Star Mines Co.* v. *California Emp. Com., supra,* (*cf.* Rest., Agency § 220) they include: "(a) [W]hether or not the one performing services is engaged in a distinct occupation or business." Antisdale was not engaged in an independent occupation in the sense that he contracted with different churches to perform various pastoral services on a job basis; the evidence shows that he was engaged solely in his work with the San Mateo church and that he could accept no other assignments as a Presbyterian minister without the consent of the Presbytery. "(b) [T]he kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision." In the locality in question, as well as elsewhere, the work of a pastor of a Presbyterian church is subject to the same supervision by the Presbytery as outlined above. "(c) [T]he skill required in the particular occupation." The element of skill is closely linked to the policy considerations that render one free from liability for the acts of an independent contractor. A property owner, for example, may be unable to understand the intricacies of erecting a building upon his land—the most that he can ordinarily be expected to do is to use care in the selection of a construction contractor. The Presbytery contends that the services here involved were "professional," like those rendered by a physician or an attorney, and that as a matter of law a minister should be regarded as an independent contractor. The skills possessed by Antisdale were also possessed by the Presbytery; it was the Presbytery in fact that determined that he was qualified for this position, whereas medical, legal, or construction experts are examined and licensed by state authority. None of the duties performed by Antisdale were too complicated for efficient supervision by the Presbytery. "(d) [W]hether the principal or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work." Although the vehicles used at the time of the accident were supplied by Antisdale and Fong, the principal instrumentalities of Antisdale's work were the property of the employer; for example, the property on which the church services and the classes of the Daily Vacation Bible School were held was leased for the church by the Presbytery. "(e) [T]he length of time for which the services are to be performed." Antisdale was officially ordained and installed

by the Presbytery in 1943; he transferred to the South Hollywood Church in 1945. So far as anything in the evidence suggests, his employment in San Mateo was on an indefinite basis. "(f) [T]he method of payment, whether by the time or by the job." Antisdale was paid by the month. "(g) [W]hether or not the work is a part of the regular business of the principal." All the activities of the church, including the Daily Vacation Bible School, revolved around the office of the pastor. "(h) [W]hether or not the parties believe they are creating the relationship of employer-employee." There is no evidence that at the time Antisdale was employed either he or the Presbytery gave any thought to the distinction between agent and independent contractor.

Although the evidence as to Antisdale's negligence is conflicting, there is substantial evidence to support the finding that he was negligent and that his negligence was a cause of the injury to plaintiff. Such a finding is supported on either of two grounds: (1) that Antisdale negligently permitted and participated in a race between his automobile and the station wagon driven by Fong, causing both vehicles to travel at an excessive speed, and forcing Fong to enter the intersection of Twenty-eighth and Isabelle Avenues on the wrong side of the roadway, thus causing the accident; and (2) that Antisdale was negligent in permitting plaintiff among others to ride on the running boards of the vehicles, and that such negligence caused the injuries of which plaintiff complains.

It is clear that Antisdale was acting in the scope of his agency at the time the tort was committed. As his principal, the Presbytery is liable for injuries to plaintiff resulting therefrom.

The verdict against the Presbytery may be supported not only on Antisdale's negligence but on that of Fong as well. Civil Code section 2351 provides: "A subagent, lawfully appointed, represents the principal in like manner with the original agent. . . ." Antisdale was an agent of the Presbytery, i.e., the "original" agent, and he lawfully appointed Fong a subagent.

An agency relationship may be informally created. No particular words are necessary, nor need there be consideration. All that is required is conduct by each party manifesting acceptance of a relationship whereby one of them is to perform work for the other under the latter's direction. (See 1 Cal.Jur., Agency, 694, 696, §§ 5, 7; Rest., Agency, §§ 15, 16, 26, 34, 225.)

There is ample evidence to support a finding that Antisdale and Fong entered into just such a relationship. Antisdale, as pastor of the church, was in charge of the Vacation Bible School. It was his responsibility to supervise and control the instruction and all activities connected with the school. He was in charge of the transportation of the children from the church to the playground and of their return to the church. He had authority to direct the activities of the children attending the school and to direct them into vehicles for transportation to the playground. He determined how long the children should remain at the playground and when they should be returned to the church.

For three days, while Antisdale was ill, Fong performed these duties for him. Fong was not a mere volunteer performing incidental services for the school; his participation was essential to the conduct of the school since, in Antidale's absence, he was the only person available to conduct Bible instruction. Fong's performance of duties for which Antisdale was responsible did not cease upon the latter's return to the school. On the day of the accident, although Antisdale had returned to the school, Fong continued to conduct the Bible class. Antisdale's own testimony shows that when Fong released the children for transportation to the playground, Antisdale took charge of the movement. He directed several of the children to leave Fong's station wagon and to get into his own automobile. He allowed the other children, including plaintiff, to remain with Fong, although he had room for several more children in his own automobile. He led the way to the playground, with Fong following closely behind. At all times Antisdale had full authority over the children in Fong's vehicle as well as in his own, and he was responsible for their conduct and safety. If Antisdale had had any doubts about Fong's driving ability or responsibility, he could have refused him permission to drive the children to the playground. Fong's continued connection with the school was possible only because Antisdale gave his consent, and it could have been severed by Antisdale at any time.

The evidence that Fong, with Antisdale's knowledge and consent, performed duties for which the latter was responsible, that his performance of those duties was subject to Antisdale's supervision and control, and that his services could be terminated by Antisdale at any time, supports the

conclusion that Fong was a subagent acting within the scope of his agency at the time of the accident. This conclusion is not negatived by the fact that Fong was not paid. (Restatement, Agency, § 225; see, also, *Graf* v. *Harvey,* 79 Cal.App.2d 64, 69 [179 P.2d 348]; *Navarro* v. *Somerfeld,* 35 Cal.App.2d 35, 37-38 [94 P.2d 623]; 1 Cal.Jur., Agency, 790, § 79.)

*Edwards* v. *Freeman,* 34 Cal.2d 589 [212 P.2d 883], does not compel a contrary result. In that case, this court held that it was an error to permit the jury to find that plaintiff was the principal of her son so as to impute his negligence to her to bar her recovery for injuries caused by the concurrent negligence of her son and the defendant. The defendant attempted to justify the submission of the issue to the jury by evidence that plaintiff had requested her son to drive her to town to get her glasses fixed and that the accident occurred in the course of that errand. This court held, however, that since the undisputed evidence established that plaintiff had no authority over her son or legal power to control his activities, the route he took, or his operation of his automobile, no agency relationship existed as a matter of law. There was in that case no "affirmative evidence adequate to show that . . . either the plaintiff was actually exercising control over the manner of operation of the car or the relationship of plaintiff and her son was such as to give plaintiff a legally cognizable right to control or command the son in his operation of the machine." (34 Cal.2d 589, 593.) The decision was based on the absence of evidence of plaintiff's right to control her son's operation of the automobile in which she rode, and not, as Antisdale implies, on the conclusion that, as a matter of law, no agency relationship can arise out of the performance of services as a gratuitous favor. (*Cf. Graf* v. *Harvey,* 79 Cal.App.2d 64, 69 [179 P.2d 348].) It is not applicable to the present appeal, in which there is ample evidence that Antisdale had the legal right to control and supervise Fong's activities, and to sever his connection with the school at any time.

The evidence shows that Daily Vacation Bible Schools were conducted by virtually all churches of the Presbyterian denomination, including those within the area governed by the Presbytery of San Francisco, and in fact the Daily Vacation Bible School of the San Mateo church antedated Antisdale's arrival there. In many respects the organization of such schools is similar to that of Sunday Schools and necessarily involves the work of volunteer teachers who assist the

minister. Antisdale testified that the children were divided into age groups and that he gave the Bible instruction to those of plaintiff's age and above. There were classes in handwork and classes in worship and the supervised recreation periods. Extensive volunteer assistance was customarily rendered by the friends and members of the church. Authority to organize the school and its staff was inherent in the nature and scope of Antisdale's duties.

 Fong was appointed in the exercise of this authority, and therefore, under the provisions of section 2351 of the Civil Code, the Presbytery may be held liable for Fong's negligence. (Civ. Code § 2349; *Malmstrom* v. *Bridges*, 8 Cal. App.2d 5, 8 [47 P.2d 336]; *Rice* v. *Trinity County*, 110 Cal. 247, 251 [42 P. 809]; *Seymour* v. *Oelrichs*, 162 Cal. 318, 323 [122 P. 847]; *Greig* v. *Riordan*, 99 Cal. 316, 322 [33 P. 913]; *Daily Telegram* v. *Ocean View Oil Co.*, 65 Cal.App. 608, 611-612 [224 P. 1006]; *Julian* v. *Schwartz*, 16 Cal.App.2d 310, 328 [60 P.2d 887]; *Thompson* v. *Gibb*, 1 Cal.Unrep. 173, 183-184; 2 Am.Jur [Agency] 145, 156-159, §§ 180, 197-199. See, also, *Bank of California* v. *Western Union Telegraph Co.*, 52 Cal. 280, 289; *Gates* v. *Daley*, 54 Cal.App. 654, 655-656 [202 P. 467]; *Hollidge* v. *Duncan*, 199 Mass. 121, 123 [85 N.E. 186]; *Campbell* v. *Trimble*, 75 Tex. 270, 271-272 [12 S.W. 863]; Mechem, *The Liability of a Master for the Negligence of a Stranger Assisting His Servant*, 3 Mich.L.Rev. 198; 13 L.R.A. [N.S.] 572; 45 L.R.A. [N.S.] 382.)

 The Presbytery next contends that the corporation that is a defendant in this suit is not the same as the religious entity that supervises the Presbyterian ministers and churches of the San Francisco area. It is claimed that the defendant corporation was organized solely to hold property of the local Presbyterian groups and is not "an operating agency of the church." The articles of incorporation of the defendant show an intention to incorporate the Presbytery *as such*—the preamble states that "the religious association heretofore and now known as and called the Presbytery of San Francisco . . . is hereby incorporated. . . ." The purpose clause, moreover, evinces no such limited objective as is now claimed. The express purposes include: "to promote, maintain and sustain in whole or in part, religious services in Presbyterian churches and missions," "to strengthen and extend the work and interests of the General Assembly of the Presbyterian church in the United States of America," and "to carry on any other business, and to exercise any other powers which may be

necessary, proper or convenient to be carried on or exercised in connection with any of the foregoing purposes or incident thereto.'' The Presbytery's supervision of the religious activities of the San Mateo Church is included within the broad scope of this language, which is simply a statement of the total purposes of the Presbytery before as well as after the incorporation.

*Plaintiff's Appeal from the Order Granting a New Trial*

After the denial of his motion for judgment notwithstanding the verdict, Antisdale moved for a new trial on all statutory grounds. His motion was granted, but the court's order specified no ground upon which it was made. Since insufficiency of the evidence to support the verdict was not specified, it must be assumed that the order granting the motion was not based on that ground. (Code Civ. Proc., § 657; *Adams* v. *American President Lines, Ltd.*, 23 Cal.2d 681, 683 [146 P.2d 1].)

In support of the motion for new trial, Antisdale contends that the trial court improperly instructed the jury that they might determine as a question of fact whether plaintiff was a guest or a passenger* in Fong's station wagon, whereas, he claims, plaintiff was a guest as a matter of law and a verdict against Fong, and Antisdale as Fong's principal, could not therefore rest on a finding that Fong failed to use ordinary care for plaintiff's safety. He contends that, since the evidence discloses that Fong performed his services gratuitously and no compensation was paid for plaintiff's ride to the playground, the only permissible finding is that plaintiff was a guest in the station wagon. Plaintiff contends that there is substantial evidence to support the inference that compensation was paid for the ride within the meaning of section 403 and that it was therefore proper to submit the question to the jury.

It is immaterial that Fong performed the services gratuitously; he performed those services as the agent of the Presbytery in discharging Antisdale's duty to transport the children to the playground for their recreation period. It is sufficient therefore if Antisdale, the church, or the Presbytery

---

*''No person who as a guest accepts a ride in any vehicle upon a highway without giving compensation for such ride, nor any other person, has any right of action for civil damages against the driver of such vehicle or against any other person legally liable for the conduct of such driver on account of personal injury to or the death of such guest during such ride, unless the plaintiff in any such action establishes that such injury or death proximately resulted from the intoxication or wilful misconduct of said driver.'' (Veh. Code, § 403.)

received a benefit from the transportation of plaintiff to the playground.

The transportation of plaintiff to the playground for the recreation period was not an isolated transaction; it was an integral part of the conduct of the Bible school as one of the normal activities of the San Mateo Presbyterian Church. It is undisputed that the attendance of the children at the Bible school was at least of mutual benefit to the children and the church. The conduct of such schools was authorized by the church laws, and it was to the interest of the church and the Presbytery that parents send their children to the school. Antisdale had a large number of handbills printed urging attendance at the school. The children had recently been released from secular schools for their summer vacation, and many parents wanted their children to spend the time in the open air. It is not an unreasonable inference that the daily open-air recreation periods were designed to induce these parents to send their children to the school and did induce them to do so. Such an inference negatives the theory that no compensation was given for the transportation to such recreation periods. "[B]enefits or considerations other than cash or its equivalent may be 'compensation.'. . ." (*Humphreys v. San Francisco Area Council,* 22 Cal.2d 436, 442 [139 P.2d 941]; *California Cas. Indem. Exchange* v. *Industrial Acc. Com.,* 21 Cal.2d 461, 464 [132 P.2d 815]; *Darling* v. *Dreamland Bedding & Upholstering Co.,* 44 Cal.App.2d 253, 257 [112 P.2d 338]; *Piercy* v. *Zeiss,* 8 Cal.App.2d 595, 598 [47 P.2d 818]; *Crawford* v. *Foster,* 110 Cal.App. 81, 84 [293 P. 841].)

The Bible school was an integral part of the activities of the church, and the recreation period an integral part of the Bible school. The conduct of the school was in part financed by the general funds of the church. In addition, the evidence discloses that contributions were solicited from the parents of children attending the school "to defray the expenses incidental to the running of the school." Antisdale testified that contributions were solicited weekly by giving the children envelopes to take home for the enclosure of contributions from their parents. Plaintiff testified that his parents made contributions therefor.

It is clear therefore that plaintiff attended a Bible school financed in part by parents' contributions to the church and by their payments to "defray the expenses incidental to the running of the school." Plaintiff's status is analogous to

that of a student at a public school who is given free school bus service and who is considered a passenger in the bus by virtue of his parents' contribution to school expenses by the payment of taxes. (*Smith* v. *Fall River Joint Union High School District*, 118 Cal.App. 673, 679 [5 P.2d 930]; see, also, *Shannon* v. *Central-Gaither Union School District*, 133 Cal. App. 124, 128 [23 P.2d 769].) It may reasonably be inferred from this evidence that compensation was given for plaintiff's ride within the meaning of section 403. (*Kruzie* v. *Sanders*, 23 Cal.2d 237, 242 [143 P.2d 704]; *Druzanich* v. *Criley*, 19 Cal.2d 439, 443 [122 P.2d 53]; *Swink* v. *Gardena Club*, 65 Cal.App.2d 674, 677-678 [151 P.2d 313]; *Carey* v. *City of Oakland*, 44 Cal.App.2d 503, 507-509 [112 P.2d 714]; *Boyson* v. *Porter*, 10 Cal.App.2d 431, 436 [52 P.2d 582].)

*Humphreys* v. *San Francisco Area Council*, 22 Cal.2d 436 [139 P.2d 941], is not in point. In that case, this court affirmed a judgment for defendant on the trial court's finding that plaintiff was in fact a guest. It was specifically recognized that a finding that he was a passenger in the vehicle would also be supported by the evidence, and that the resolution of conflicting evidence was for the trier of fact.

Antisdale next contends that it was improper for the trial court to instruct the jury that they might find him to be Fong's principal and therefore liable for Fong's negligence. We have already discussed the relationships between the Presbytery and Antisdale and between the Presbytery and Fong, and we have accepted plaintiff's contention that both Antisdale and Fong were agents of the Presbytery. Antisdale expressly adopts this contention and relies in addition on Civil Code section 2351, which provides: "A subagent, lawfully appointed, represents the principal in like manner with the original agent; and the original agent is not responsible to third persons for the acts of the subagent."

The doctrine of *respondeat superior* is not applicable to the relationship between a supervisor and his subordinate employees. The supervisor occupies an economic and legal position quite different from that of the employer. It is not the supervisor's work that is being performed, nor does he share in the profits which the employees' conduct is designed to produce. In the usual situation, furthermore, he, like his subordinates, is a wage earner, and he is seldom able to respond in damages to an appreciably greater extent than they. For these reasons, the law has shifted financial responsibility from the supervisor, who exercises immediate control,

to the employer, who exercises ultimate control and for whose benefit the work is done. (*Bank of California* v. *Western Union Telegraph Co.*, 52 Cal. 280, 288-292.) Section 2351 of the Civil Code codifies this principle and has been uniformly interpreted to exempt superior employees from vicarious liability to third persons for the tortious conduct of subordinates. (*Hilton* v. *Oliver*, 204 Cal. 535, 539 [269 P. 425, 61 A.L.R. 297]; *Handley* v. *Lombardi*, 122 Cal.App. 22, 29 [9 P.2d 867]; *Barton* v. *McDermott*, 108 Cal. App. 372, 384 [291 P. 591]; *Los Angeles* v. *Los Angeles Pacific Navigation Co.*, 84 Cal.App. 413, 419 [258 P. 409]. See, also, Restatement, Agency, section 358(1); *Ellis* v. *Southern Railway Co.*, 72 S.C. 465, 473 [52 S.E. 228, 2 L.R.A.N.S. 378]; 61 A.L.R. 290.) ██ It was therefore error to instruct the jury that they might find Antisdale liable for Fong's negligence. ██ Since there was a substantial conflict in the evidence as to whether Antisdale himself was negligent, it cannot be determined whether the jury based its verdict against Antisdale on that ground or on the erroneous agency instructions that he could be found liable for Fong's negligence. Under these circumstances it was proper for the trial court to grant the motion for new trial. (*Mazzotta* v. *Los Angeles Ry. Corp.*, 25 Cal.2d 165, 169, 170-171 [153 P.2d 338]; *Bieser* v. *Davies*, 119 Cal.App. 659, 663 [7 P.2d 388]; *Middleton* v. *California Street Cable Railway Co.*, 73 Cal.App.2d 641, 646-647 [167 P.2d 239]; see, also, *Oettinger* v. *Stewart*, 24 Cal.2d 133, 140 [148 P.2d 19, 156 A.L.R. 1221].) This determination does not affect the Presbytery, for it is clearly liable for Fong's negligence whether or not the jury based its verdict against Antisdale on the ground that Antisdale was negligent.

The judgment in favor of the Presbytery of San Francisco is reversed, and the trial court is directed to enter a judgment against the Presbytery in accordance with the verdict of the jury. The order granting a new trial as to Antisdale is affirmed.

Gibson, C. J., Edmonds, J., Carter, J., and Spence, J., concurred.

SCHAUER, J.—I concur in the judgment. In so doing I think it proper to note, however, that in my view[1] Fong was a

---

[1]For the reasons and upon the grounds more fully discussed in the opinion prepared by Mr. Justice Goodell for the District Court of Appeal, First Appellate District, Division Two, which discussion appears at pages 52-53 of the opinion as reported in 220 P.2d 48.

mere volunteer over whose conduct neither Antisdale nor the Presbytery had any authority or right to exercise control and whose negligence cannot be related to them on the theory of *respondeat superior.* It would follow that the judgment to be entered against the Presbytery as directed by the majority should not stand as against a motion for new trial or an appeal (see *Lauritsen* v. *Goldsmith* (1929), 99 Cal.App 671, 676 [279 P. 168]; *Ferran* v. *Mulcrevy* (1935), 9 Cal.App.2d 129, 131-133 [48 P.2d 948]; *Sutherland* v. *Palme* (1949), 93 Cal.App.2d 307, 314-315 [208 P.2d 1035]; *Fortier Trans. Co.* v. *Union Packing Co.* (1950), 96 Cal.App.2d 748, 756-757 [216 P.2d 470]), for the same reasons which the majority hold require a new trial as to Antisdale, i.e., liability of the Presbytery turns upon liability of Antisdale, and if a new trial is proper as to the latter it is likewise required as to the Presbytery.

Shenk, J., concurred.

Respondent's petition for a rehearing was denied June 28, 1951. Shenk, J., and Schauer, J., voted for a rehearing.