**APE POUTOA, SISIGAFU'A and ELISE APE, Plaintiffs**

**v.**

**AMERICAN SAMOA GOVERNMENT, and SEFO PASENE, Defendants**

High Court of American Samoa
Trial Division

CA No. 99-92

October 23, 1996

Before KRUSE, Chief Justice, TAUANU'U, Chief Associate Judge, BETHAM, Associate Judge.

Counsel:      For Plaintiffs, Afoa Moega Lutu
              For Defendant American Samoa Government, Henry
              W. Kappel, Assistant Attorney General

Decision and Order:

On or about February 20, 1992, plaintiff Ape Poutoa ("Ape") sustained injury following a head-on automobile collision with an American Samoa Government ("ASG") vehicle. Ape's vehicle, a 1985 Izuzu Trooper, was rendered a total loss. The parties have stipulated that the Blue Book's retail value of the vehicle is $5,950, and wholesale value to be $3,800.[1]

Riding in the vehicle with Ape at the time were his wife Sisigafu'a and daughter Elise. The driver of the ASG vehicle was defendant Sefo Pasene ("Pasene"). According to Pasene's version, the collision arose after he had fallen asleep at the wheel. On the other hand, Sisigafu'a claims that Pasene crossed the highway median toward oncoming traffic after overtaking several vehicles.

Ape and his family filed suit against ASG for damages for personal and property injury, and loss of consortium, alleging negligence on the part of ASG's employees Pasene, for operation of the vehicle, and Pasene's supervisor, Vala Ieremia (hereinafter "Ieremia"), for entrusting the vehicle to Pasene in the first place.

There is no dispute as to Pasene's negligent operation of the vehicle. The question is whether ASG is liable under A.S.C.A. § 42.1211.[2] ASG

---

[1] We are not aware of an established wholesale used-car market on-island, nor were we shown any evidence to this effect.

[2] A.S.C.A. § 43.1211 provides a remedy against ASG for damages arising because of death, personal, and/or property injury caused by the negligence of any government employee, while acting within the scope of his office or employment.

41

contests liability on the grounds that Pasene could not have been acting within the scope of employment, since he was not formally employed by ASG.[3] We hold that ASG is liable.

The evidence shows that Pasene was at all relevant times, a resident immigrant under the sponsorship of Ieremia ("Ieremia"), who at all relevant times, was employed by ASG as principal of its Vocational Educational School ("Voc Ed") at Tafuna. According to Dr. Lealofi Uiagalelei ("Uiagalelei"), Director of the Department of Education at the time of the accident, Ieremia had succeeded an expatriate contract employee who was apparently hired by the Department of the Interior under certain federal funding that set up the Voc Ed. This expatriate's employment terms included his access to an ASG vehicle after hours. He was effectively allowed complete discretion over the vehicle's use, although it was understood that the vehicle would be used during the day for Voc Ed purposes. The Department of Education permitted this same arrangement with the Voc Ed vehicle to continue into Ieremia's tenure. According to Uiagalelei, Ieremia effectively had complete control over the use of the Voc Ed's vehicle, including its use after hours.

Ieremia had earlier approached Uiagalelei about hiring a replacement grounds-keeper/janitor for Voc Ed, since he was dissatisfied with the performance of Voc Ed's incumbent and aging, but career service, grounds-keeper/janitor; he urged Uiagalelei for more able-bodied help. Uiagalelei testified that he was not receptive to the idea of terminating a career service employee without sufficient documentation of poor performance on his personnel file. Ieremia nonetheless retained Pasene to work at Voc Ed, while promising the latter that his paper work was being processed. On this representation, Pasene understood that ASG would eventually pay him. Indeed, by the time of the accident, Pasene had dutifully worked at Voc Ed for a period of approximately eighteen months, working directly under the control and direction of Ieremia.

On the day in question, Pasene had reported to work as usual at the Voc Ed and went about his usual duties of cleaning the premises and carting away trash using the Voc Ed vehicle. Ieremia had to leave early that day

---

[3] ASG initially admitted that Pasene was its employee. Just before the scheduled date of trial, however, ASG moved for leave to amend its answer and retract its admission of employment. For reasons already discussed elsewhere, leave was denied. *See Ape v. American Samoa Government*, CA No. 99-92, (Trial Div. 1993) (Order On Motion to Amend Pleadings, Add Parties, and Cross-Claim, entered Dec. 29, 1993). Nonetheless, the government continues to argue against liability, contending that Pasene was not acting within the scope of his employment.

for some business in the town area, and as the vehicle was being utilized for trash removal at the time, he instructed Pasene to deliver the vehicle at the end of the day to ASG's Motor Pool compound. In fact, Ieremia's directive, as well as Pasene's previous operation of the vehicle, were not in accordance with the executive branch's duly published rules relating to the use of ASG motor vehicles. Among other things, Pasene did not have an ASG Driver's Permit to operate a government vehicle, as required by A.S.A.C. § 4.0707(2) and (4).

## DISCUSSION

### A. Liability

ASG's argument is essentially that: (1) Pasene was illegally hired, was not a government employee, and that vicarious liability can therefore not attach; and (2) no employment contract exists, and it is therefore impossible to determine whether Pasene was acting within the course and scope of his employment while driving the vehicle.

ASG has erroneously focused on the narrow questions of whether a formal employment relationship existed between the Pasene and ASG, and whether Pasene's conduct was within the scope of a written job description. The proper inquiry involves the broader questions of whether a common law master/servant relationship existed between Pasene and ASG, and whether Pasene was acting within the scope of that agency when he engaged in tortious conduct.

While there are many forms of agency, the relationship of master and servant is a species of agency in which the principal may be liable for the torts of the agent. *See* RESTATEMENT (SECOND) OF AGENCY, § 219 (1984). Whether a master/servant relationship has been established depends on a number of factors, the most important of which is the master's right to control the physical conduct of the servant. *See* RESTATEMENT (SECOND) OF AGENCY, § 220(1) (1984). Servants are also capable of appointing subservants, who act under the primary control of the servant but who create liabilities for both the servant and the master. *See* RESTATEMENT (SECOND) OF AGENCY, § 5, comment e on Subsection (2); *id.* § 219, comment b (1984).

ASG, in essence, argues that Pasene is not ASG's subservant because Ieremia had no actual authority to give ASG's consent to beget a subservant. The government further states that the Director of the Department of Education had not given express written consent to Pasene's employment and that Ieremia's attempt to hire Pasene was "void" because it was not in accordance with administrative regulations.

43

■ However, under certain circumstances, a servant may appoint a subservant although the servant has no actual authority to appoint.

> A general agent for a disclosed or partially disclosed principal subjects his principal to liability for acts done on his account which usually accompany or are incidental to transactions which the agent is authorized to conduct if, although they are forbidden by the principal, the other party reasonably believes that the agent is authorized to do them and has no notice that he is not so authorized.

RESTATEMENT (SECOND) OF AGENCY, § 161 (1984).

In the instant case, the evidence at trial indicated Ieremia, the head of a Voc Ed, was solely responsible for maintaining the Voc Ed educational facilities in good working order. Defendants failed to challenge effectively Ieremia's testimony that after the hurricane, many individuals in government positions equivalent to Ieremia were "hir[ing]" workers without formal paperwork to fulfill maintenance, repair, and sanitation duties. Thus, Ieremia's act of hiring Pasene was "incidental" to his ASG-authorized function of ensuring that the Voc Ed was a clean, safe educational environment. Furthermore, while hiring did not "usually accompany" Ieremia's duties under normal conditions, it appears that undocumented temporary hiring did "usually accompany" the duties of ASG servants after a hurricane. Pasene, for his part, reasonably and actually believed that Ieremia had the power to appoint him as a general or special subservant, received no notice to the contrary, and consented to act on behalf of Ieremia, according to Ieremia's direction, and for ASG's business purposes. The evidence thus indicates that Ieremia subjected his master, ASG, to liability for Pasene's actions by creating a valid master/servant/subservant relationship. The fact that no contract was signed, nor consideration given to Pasene does not undermine the validity of this agency relationship. *See Malloy v. Fong*, 37 Cal.2d 356, 232 P.2d 241 (1953); *Georgeson v. Nielson*, 252 N.W. 576 (Wis. 1934).

Finally, ASG claims that Pasene acted outside the scope of his agency because ASG internal policy prohibited the use of a vehicle by one without an ASG driver's permit. While we have no written document outlining the nature and extent of Pasene's duties as ASG's subservant, we have no trouble determining that the scope of that agency relationship includes Pasene's operation of a government vehicle, pursuant to a direct order of his government supervisor, to return the vehicle to a government Motor Pool Compound. In the present case, ASG furnished the vehicle, the instrumentality of harm; ASG commonly authorized servants to utilize the instrumentality of harm; and Pasene used the instrumentality

of harm at a time, place, and for a purpose generally authorized by ASG. For these reasons, Pasene's tortious conduct, although not expressly authorized, is within the scope of employment. *See* RESTATEMENT ·(SECOND) OF AGENCY, § 229 (2) (a), (b), (h) (1984). The present case is thus factually distinct from *Tauiliili v. ASG*, 13 A.S.R.2d 61 (Trial Div. 1989), in which the government employee operated a government vehicle after work hours, in the absence of express direction from a government supervisor, and for a personal, rather than a business purpose.

■ Moreover, inherent in the power of agency, is the power of the agent to subject the principal to liability for unauthorized conduct. *See* RESTATEMENT (SECOND) OF AGENCY, § 8A, comment b (1984) (stating that a master's liability for the faulty conduct of a servant performing the master's business does not stem from tort theory, but rather inheres in the agency relationship itself); *id.* § 219(2)(d) (stating that the master is still liable for the torts of his servants acting outside the scope of their employment where the servant was aided in accomplishing the tort by the existence of the agency relation). As long as the servant is acting in his master's business and intends so to act, the master will be liable for the servant's actions, even if there is no "connection between the [master]'s conduct and the harm done." *Id.* Again, in the instant case, Pasene was driving the vehicle for a legitimate ASG purpose at the time of the act, Pasene was intending to further ASG's interests in so acting, so ASG must be liable for Pasene's "unauthorized" conduct.

The implications of adopting the ASG position would be alarming. If the government were to prevail, then the government would have an incentive to maintain sloppy records, to make verbal rather than written contracts for services, hire illegal aliens, etc. Any technical deviation from government hiring policies would enable ASG to harvest the fruits of labor and yet skirt liability under the Government Tort Liability Act because "the 'hiring' was void." Alternatively, the government could simply create an internal regulation that "no person shall drive government vehicles and a reckless or negligent manner" and argue that the regulation would obviate ASG's liability for the tortious conduct of its government drivers. We cannot allow self-serving statements to render impotent the common law doctrine of *respondeat superior* and to eviscerate the public policy interests that the doctrine advances.

## B. Damages

At the time of the collision, Ape was 70 years of age and a retiree. Following the collision, he was transported to the LBJ Tropical Medical Clinic (the "hospital), where he was found to have a very swollen left lower thigh and knee, as well as a very swollen left scrotum. Additionally he was observed with abrasions on the left side of his knee,

and contusions about his lower back. X-Rays revealed a very comminuted fracture of the lower third left femur; this area of bone was shattered into pieces.

Dr. Vaiula Tuato'o, an orthopaedic surgeon and Chief of Surgery at the LBJ Tropical Medical Center was consulted the following day on a course of treatment. Initially, treatment was extended traction with Ape flat on his -back for about four months while he was monitored by repeated X-rays. After traction, Ape was slowly introduced to course of physiotherapy, first to a period of readjustment after being inert for 4 months, and then gradually towards ambulation with the aid of crutches. One month after traction, Dr. Tuato'o began encouraging Ape to put some weight on the injured leg, and eleven months after the accident, Ape was allowed to walk with one crutch. Dr. Tuato'o also attested to ongoing pain suffered by Ape and his being periodically prescribed with pain medication, although Ape was also seen to be a model of tolerance and of cheerful disposistion notwithstanding the trauma that befell him.

By the time of trial, two years after the collision, new bone, "callus," had set in and apparently fused all the shattered bone fragments into a "solid" whole. The process of healing was by then nearly complete. However, Dr. Tuato'o also testified to an anticipated total knee replacement operation that was already scheduled off-island. He further testified that while Ape's pre-accident medical records revealed complaints about pain in his knees as well as degenerative signs through the normal aging process, the severe stage of osteoarthritis in Ape's non-injured right knee was significantly advanced as the result of his favoring his left knee during the healing process. On cross-examination, Dr. Tuato'o ventured the opinion that about 50% of Ape's degenerative changes that he was then experiencing was attributable to the trauma that he suffered, and 50% to non-trauma factors such as age and obesity. We noted from Ape's pre-accident medical records that he had a well documented history of complaints relating to pain in his knees, commencing as early as 1982.

Trial was subsequently continued while Ape left the island for a further operation which took place in February 1994. The off-island operation as explained by Dr. Tuato'o was the total knee replacement which he had earlier alluded to. According to Dr. Tuato'o, the operation while eliminating the pain previously experience by Ape, also produced a permanent disability in terms of range of movement in the knee; that while normal range of flex is 140°, Ape's resultant range of flex was about 45°. Translated in terms of everyday practicalities, Dr. Tuato'o stated that Ape could no longer sit cross-legged in traditional fashion, and he could no longer bend down to pick things up. Finally, Dr. Tuato'o further recommended that if Ape's degenerative related pain problems are to be arrested altogether, a total knee replacement operation

46

was required on his right knee as well. In the meanwhile, Ape continues to be prone to pain.

With regard to Sisigafu'a and Elise's claims, the former testified that she had the wind knocked out of her, and that the collision caused their vehicles windshield to shatter and fall onto her inside the car, resulting in her receiving cuts and abrasions to her face and feet. She testified that her injuries were cleansed and treated at the outpatient clinic and was later discharged with analgesics. She further claimed that she required seven stitches to one of her feet, although we were not provided with any supporting medical records to this effect. In terms of her daughter's claim, Sisigafu'a testified that Elise suffered a cut on area of her eyebrow.

Taking into account typical damage awards in American Samoa for pain and suffering, the extent of Ape's disability attributed to the trauma, as well the likelihood of future medical attention, we assess Ape's general damages in the sum of $40,000. We assess his property damage, total loss of the vehicle, in the sum of $6000. With regard to Sisigafu'a and Elise's claim we assess the former's general damages in the sum of $1,500, and the latter's general damages in the sum of $500. We found the evidence insufficient to establish plaintiffs' other items of damage claimed.

Judgment will enter against the defendants accordingly.

It is so ordered.